Filed 3/27/19; Certified for partial publication 4/23/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JAMES STROUSE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>WEBCOR CONSTRUCTION, L.P.,<br><br>     Defendant, Cross-complainant and Appellant;<br><br>ACCO ENGINEERED SYSTEMS,<br><br>     Cross-defendant and Respondent. | A148863<br><br>(Alameda County<br>Super. Ct. No. RG13670376) |

Webcor Construction, L.P. (Webcor) was the general contractor for the rehabilitation of the California Memorial Football Stadium in Berkeley (the Project). Webcor hired ACCO Engineered Systems (ACCO) to perform ventilation and plumbing services on the Project. James Strouse, an ACCO employee, suffered a workplace injury when his leg fell into a 12-inch deep expansion joint after the plywood safety cover gave way. He sued Webcor for negligence, and Webcor filed a cross-complaint against ACCO for indemnity. A jury found Webcor 100 percent liable for Strouse's injuries.

On appeal, Webcor contends the trial court erred in instructing the jury using CACI No. 1009B, which, in Webcor's view, does not accurately state the holding of *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 (*Hooker*). Webcor further contends the trial court erroneously instructed on negligence per se based on regulations promulgated under the California Occupational Safety and Health Act (Cal-OSHA). Finally, Webcor argues the trial court erred in granting ACCO's motion for attorney fees. We affirm the judgment.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *Webcor's Contract with the University of California and Subcontract with ACCO*

In 2009, Webcor entered into a contract with the University of California (UC) for the "California Memorial Stadium Seismic Safety Improvements." Under the contract, Webcor was "solely responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the performance of the Contract." Webcor was required to take adequate precautions to prevent damage, injury, or loss to "Employees involved in the Work and other persons who may be affected thereby." The contract also required Webcor to "designate a responsible member of [its] organization at the Project site whose duty shall be the prevention of accidents." Webcor was further obligated to "continuously require and follow up with Subcontractors about their job site maintenance and their conformance in providing a safe work place," "enforce all safety-related requirements in the Contract Documents," and "review, monitor and coordinate the implementation of individual Subcontractors' Safety Programs."

Webcor hired ACCO to perform ventilation and plumbing services on the Project. Under the subcontract, ACCO agreed to "comply fully with all laws, orders, citations, rules, regulations, standards and statutes with respect to occupational health and safety [and] . . . accident prevention," to "conduct inspections to determine that safe working conditions and equipment exist of their work area," and to "accept[] sole responsibility for providing a safe place to work for its employees."

Webcor's Safety Manual was part of the contract documents that ACCO was required to follow. It required ACCO employees to report any unsafe practice or condition to their supervisor immediately, and also report unsafe conditions to Webcor. With regard to floor openings, the Webcor Safety Manual reminded ACCO to check that openings were covered and that covers were secured and identified.

B. *Webcor's Expansion Joints and Safety Covers*

An expansion joint is a gap left between concrete sections of a structure to allow the sections to move independently in the event of an earthquake. As part of the seismic

2

upgrade of the stadium, Webcor created and constructed 50 expansion joints that were placed throughout the structure.

Before a permanent covering is installed over each expansion joint, there is a gap 12 inches wide and 12 inches deep in the concrete. The gaps must be covered or have guardrails around them. For the Project, Webcor's carpenters designed, constructed, and installed protective plywood covers for all of the expansion joints.

It was undisputed at trial that Webcor was responsible for the Project's general access areas, which were described as areas like "hallways" used by "everyone" including subcontractors for making deliveries and accessing different areas of the stadium. Strouse's accident occurred at an expansion joint in line 53, a general access area near a loading dock used by ACCO and other subcontractors to make deliveries. Because this was a high-traffic area, the safety covers for the expansion joints had to withstand two times the maximum anticipated load, which would require either a metal plate or two layers of three-quarter inch plywood that were secured and labeled "do not remove." Webcor's site safety manager, Joe Villela, instructed Webcor's carpenters to make sure the safety covers were secured and had smooth transitions.

Webcor's carpenter foreman, Victor Paz, testified that the safety covers were constructed with doubled-up three-quarter inch plywood, sized to cover the 12-inch gap. The wood was anchored with 16-penny nails, roto-hammered in place, and secured with pieces of tie wire. Webcor tested the design of the safety covers by driving a scissor lift over them to ensure they were strong and stayed in place.

Villela testified Webcor was the sole entity that maintained the safety covers, and Webcor carpenters were the only ones allowed to repair them. This was a duty Webcor "did not delegate to its subcontractors." ACCO did not perform any work on the safety covers and was not allowed to do any carpentry work on the Project. Subcontractors were told during weekly meetings to notify Webcor if they needed to remove a safety structure to perform their work, and Webcor would remove and replace it. Villela testified it was reasonable for ACCO employees to trust that Webcor had properly installed, secured, and inspected the safety covers.

3

**C. *Reports of Unsecured Covers***

Prior to Strouse's accident, Webcor knew that the safety covers in the line 53 area had been damaged or had become unsecured due to subcontractors removing them without securing them back in place. ACCO's general foreman Chris Ensel testified that he brought up the condition of the safety covers to Villela and informed him that people were removing safety covers to perform work in the expansion joints. The condition of the safety covers was "brought up more than a couple times" by Ensel and other tradesmen in the weekly foreman meetings when Webcor was asking for input. Ensel felt his concerns were not being adequately addressed, and he was dissatisfied with the response he received from Villela. Eventually, however, Ensel became "accustomed" to the condition and stopped bringing it up.

Ensel did not contact ACCO's safety department about the safety covers as required by ACCO's mitigation escalation path. He was aware that ACCO's subcontract required it to provide its employees with a safe place to work, but he felt this was not a "reachable goal" because Webcor was not adequately supporting ACCO.

**D. *Webcor's Retained Control of Safety on the Jobsite***

Webcor's safety expert J. Robert Harrell testified that Webcor retained overall safety responsibility on the job site. Villela testified that he was responsible for conducting daily inspections of the jobsite to look for safety problems, as required by Webcor's contract with the UC, even on weekends if workers were present (as they were the weekend before Strouse's accident). Up to 12 superintendents and 12 foremen of Webcor were also required to perform daily inspections. Villela was responsible for documenting each of his daily inspections in an inspection report.

The last documented inspections before Strouse's January 9, 2012, accident were conducted on January 3, 4, and 5, 2012. There was no documentation of any inspection on January 6, 7, or 8, 2012, even though there were workers at the site on those days. Although Villela initially testified that he had performed, but simply failed to log, inspections on January 6, 7, and 8, he later testified that he did not conduct an inspection on January 7 or 8, and was not present at the jobsite on either of those days. He did not

4

know if foremen or a superintendent present on those days performed the daily inspections.

Villela further testified it was his job to ensure that safety conditions at the jobsite complied with applicable Cal-OSHA regulations.[1]  The Webcor Safety Manual specifically required Webcor to comply with section 1632.  Both Strouse's safety expert, Gerald Fulghum, and Webcor's safety expert, Harrell, testified that Webcor, as the "controlling employer," was responsible for compliance with section 1632 on the jobsite.

### E. *The Accident*

On the morning of January 9, 2012, a crew of seven ACCO employees was unloading materials from an ACCO truck at an access point into the stadium.  The ACCO crew made multiple trips across an expansion joint at line 53.  The area around line 53 was covered with plywood.

Walking immediately in front of Strouse was Alexander Osborne, a first-year ACCO apprentice.  As he walked across the expansion joint, he felt the plywood move a sixteenth to an eighth of an inch.  Crossing the expansion joint behind Osborne was Strouse, who was carrying a large section of spiral pipe on his shoulder.  As Strouse crossed the expansion joint, the plywood gave way.  One of Strouse's legs went down into the joint, causing injuries to his knee, hip, and sacroiliac.

The safety cover involved in Strouse's accident appeared to have been modified from its original condition, as plywood had been pried up so that a cable could be run underneath.  Strouse's safety expert, Fulghum, testified that the condition of the area

---

[1]     The applicable Cal-OSHA regulation is found in California Code of Regulations, title 8, section 1632 (hereinafter "section 1632"), part of subchapter 4, entitled "Construction Safety Orders."  It requires floor openings at a construction site to be "guarded by . . . covers."  (Cal. Code Regs., tit. 8, § 1632, subd. (b)(1).)  "Covers shall be capable of supporting the greater of 400 pounds or twice the weight of the employees, equipment and materials that may be imposed on any one square foot area of the cover at any time.  Covers shall be secured in place to prevent accidental removal and displacement, and shall bear a pressure sensitized, painted, or stenciled sign with legible letters not less than one inch high, stating: 'Opening—Do Not Remove.'  Markings of chalk or keel shall not be used."  (*Id*., subd. (b)(3).)

around line 53, as depicted in the photographs, constituted a safety hazard. Even though two layers of plywood were used in some places, they appeared to be "lapped," and there were gaps and holes. Webcor's safety expert, Harrell, also testified the photographs showed a safety cover that was not properly maintained.

### F. *The Instant Lawsuit*

In 2013, Strouse filed a complaint and first amended complaint against Webcor for general negligence. Webcor answered the first amended complaint and filed a cross-complaint against ACCO, seeking to enforce a contractual defense and indemnity provision against ACCO.

Trial commenced in March 2016. In April 2016, the jury rendered a special verdict finding that Webcor designed the safety cover where Strouse fell; Webcor retained control over the safety cover and safety conditions where Strouse fell; Webcor negligently exercised its retained control over safety conditions; and Webcor's negligence was a "substantial factor" in causing harm to Strouse. Finding that neither ACCO nor Strouse was negligent, the jury apportioned no fault to them and attributed 100 percent of the fault to Webcor. Judgment was entered in favor of Strouse in the amount of $2,626,750, and in favor of ACCO on Webcor's cross-complaint. Webcor moved for judgment notwithstanding the verdict (JNOV) and for a new trial. Both motions were denied.

ACCO moved for attorney fees as the prevailing party in Webcor's cross-action. The motion was granted in the amount of $298,843.

Webcor appealed the judgment, as well as the post-judgment orders denying its motions for JNOV and a new trial and the order granting ACCO's motion for attorney fees.

### DISCUSSION

### A. *The* **Privette** *Doctrine and Exceptions*

Webcor's contentions on appeal implicate the so-called "*Privette* doctrine" set forth in *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*) and its progeny.

6

Accordingly, we provide a general overview of the doctrine before addressing Webcor's claims.

In *Privette*, our Supreme Court held that when an employee of an independent contractor is injured in the workplace, he or she may not recover tort damages from the hirer of the independent contractor. The court concluded it would be unfair to permit the injured employee of an independent contractor to obtain full tort damages from the hirer because work-related injuries are compensable under the exclusive remedy of the Workers' Compensation Act (Lab. Code, § 3200 et seq.), and the hirer likely paid indirectly for the workers' compensation insurance as a component of the contract price but had no right to reimbursement from the contractor.[2] Thus, workers who happened to work for an independent contractor would enjoy a windfall that is not available to other workers. (*Privette*, *supra*, 5 Cal.4th at pp. 698–700.)

In *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 (*Toland*), the Supreme Court held that the hirer of an independent contractor has no obligation to specify in the subcontract the special precautions the contractor must take for the safety of the contractor's employees. (*Toland*, at p. 267.) The court held that such liability would negate the hirer's "right to delegate to independent contractors the responsibility of ensuring the safety of their own workers." (*Id*. at p. 269.)

In *Hooker*, *supra*, 27 Cal.4th 198, and *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219 (*McKown*), the Supreme Court articulated an exception to the *Privette* doctrine. Under this exception, the hirer of an independent contractor may be liable to the contractor's injured employee when the hirer has retained control over safety conditions at a worksite, and the hirer's negligent exercise of retained control has "affirmatively contributed" to the employee's injuries. (*Hooker*, at p. 202; *McKown*, at

---

[2] Under the Workers' Compensation Act, "an employer that provides compensation coverage has no further liability for workplace injuries to an employee. Therefore, if a nonnegligent third party pays damages for an employee's injuries that are attributable in whole or in part to the negligence of the employer, the [Workers' Compensation] Act's limitations on employer liability preclude the third party from obtaining equitable indemnity from the employer." (*Privette*, *supra*, 5 Cal.4th at p. 698.)

p. 222.)  As the court explained, "Imposing tort liability on a hirer of an independent contractor when the hirer's conduct has affirmatively contributed to the injuries of the contractor's employee is consistent with the rationale of our decisions in *Privette*, *Toland* and *Camargo* [*v. Tjaarda Dairy* (2001) 25 Cal.4th 1235] because the liability of the hirer in such a case is *not* ' "in essence 'vicarious' or 'derivative' in the sense that it derives from the 'act or omission' of the hired contractor." ' [Citation.]  To the contrary, the liability of the hirer in such a case is *direct* in a much stronger sense of that term." (*Hooker*, at pp. 211–212.)

*Hooker* involved the death of a crane operator employed by a contractor hired by the California Department of Transportation (Caltrans) to construct an overpass.  The decedent was killed when, after retracting the crane's outriggers to allow construction vehicles to pass, he attempted to swing the boom without first reextending the outriggers, causing the crane to tip over. (*Hooker*, *supra*, 27 Cal.4th at p. 202.)  The Supreme Court upheld summary judgment in favor of Caltrans against the decedent's estate, finding the estate failed to raise triable issues of material fact that Caltrans affirmatively contributed to the decedent's death.  Although Caltrans had retained control over safety conditions at the worksite in permitting traffic to use the overpass, the court concluded Caltrans did not affirmatively contribute to the crane operator's unsafe practice.  (*Id*. at p. 215.)

In a footnote, *Hooker* explained that affirmative contribution "need not always be in the form of actively directing a contractor or contractor's employee.  There will be times when a hirer will be liable for its omissions.  For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Hooker*, *supra*, 27 Cal.4th at p. 212, fn. 3.)

In *McKown*, the employee of an independent contractor was injured by a defective forklift that belonged to the hirer and which the hirer asked the contractor to use in performing the work. (*McKown*, *supra*, 27 Cal.4th at p. 223.)  *McKown* held that "when a hirer of an independent contractor, by negligently furnishing unsafe equipment to the contractor, affirmatively contributes to the injury of an employee of the contractor, the

8

hirer should be liable to the employee for the consequences of the hirer's own negligence." (*Id*. at p. 225.)

In *SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590 (*SeaBright*), the Supreme Court applied the *Privette* rule where a hirer failed to comply with Cal-OSHA workplace safety requirements concerning the precise subject matter of the contract, and the injury allegedly occurred as a consequence of that failure. In *SeaBright*, an airline hired a contractor to maintain and repair a conveyor used to move luggage, and an employee of the contractor was injured when his arm got caught in the conveyor. (*SeaBright*, at p. 594.) The conveyor lacked safety guards required by applicable regulations. (*Ibid*.) The Supreme Court held the airline was not liable for the contractor's employee's injuries because the airline implicitly delegated to the contractor any tort law duty it owed to the contractor's employees to ensure the safety of the specific workplace that was the subject of the contract, and this included any tort law duty the airline owed to the contractor's employees to comply with applicable statutory or regulatory safety requirements. (*Id*. at p. 594.)

With these authorities in mind, we now turn to Webcor's claims of instructional error.

**B.** *Claims of Instructional Error*

Webcor argues the trial court erred by instructing the jury with CACI No. 1009B, which omits any language that a hirer "affirmatively contribute" to the plaintiff's injury, and uses "substantial factor" causation in lieu of "affirmative contribution." Webcor contends the trial court erred in rejecting its proposed instructions—one based on BAJI No. 8.30, and two special instructions further elaborating on affirmative contribution— which would have clearly and accurately informed the jury on the applicable law.

Webcor also contends the trial court erred by instructing the jury on negligence per se based on workplace safety regulations promulgated under Cal-OSHA because: (1) the jury was not first instructed to find affirmative contribution by Webcor; and (2) Webcor had delegated its Cal-OSHA responsibilities to ACCO in the subcontract.

9

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) "The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) " '[I]n determining whether or not the instructions given are correct, we must assume that the jury might have believed the evidence upon which the [cause of action or defense of] the losing party was predicated, and that if the correct instruction had been given upon that subject the jury might have rendered a verdict in favor of the losing party.' " (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 674.)

" 'That is not to say, however, that a failure properly to instruct a jury is necessarily or inherently prejudicial.' " (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 655.) "[T]here is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citation.] . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Soule*, *supra*, 8 Cal.4th at p. 580.) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

We address Webcor's claims of instructional error in seriatim.

## 1. CACI No. 1009B

CACI No. 1009B applies to claims against hirers for negligently retaining control over worksite safety. The instruction given by the trial court stated, in relevant part: "To establish this claim, Mr. Strouse must prove all of the following: [¶] 1. That Webcor Construction controlled the area of the worksite where James Strouse fell; and [¶] 2. That Webcor Construction retained control over safety conditions at the location where James Strouse fell; and [¶] 3. That Webcor Construction negligently exercised its retained control over safety conditions by failing to make sure the expansion joint covers were safe for people to walk over them; and [¶] 4. That James Strouse was harmed; and [¶] 5. That Webcor Construction's negligent exercise of its retained control over safety conditions was a substantial factor in causing James Strouse's harm." The trial court gave CACI No. 430 to define "substantial factor." It stated, in relevant part: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of harm. [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct."

The crux of Webcor's instructional error claim as to CACI No. 1009B is that it wrongly equates "substantial factor" causation with "affirmative contribution" even though they are distinct legal concepts.[3] Webcor argues that the policies underlying the

---

[3]     In its reply brief, Webcor additionally contends that under *Trejo v. Johnson* (2017) 13 Cal.App.5th 110 (*Trejo*), the special verdict was defective because the trial court failed to submit a key element to the jury, and it cannot be inferred from the jury's findings that it resolved this controverted issue. Strouse moved to strike this portion of Webcor's reply brief as a new argument not raised in the opening brief, and ACCO joined the motion. We deferred ruling on the motion and ordered that it be considered with the appeal. We now grant it. Although *Trejo* was not available at the time Webcor filed its opening brief, the rule for which it is cited—that a special verdict is fatally defective if it does not allow the jury to resolve every controverted issue—is not new. (See *Trejo*, at pp. 136–137, citing *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1240; *Falls v. Superior Court* (1987) 194 Cal.App.3d 851, 854–855.) Because Webcor did not raise this argument in its opening brief, it was improper

11

two standards are different, as the substantial factor test was chosen over the "but for" test to protect plaintiffs in comparative fault tort cases, while the affirmative contribution requirement was borne out of an effort to protect hirer defendants from lawsuits by employees of their subcontractors.

This same argument was rejected by the Court of Appeal in *Regalado v. Callaghan* (2016) 3 Cal.App.5th 582 (*Regalado*). As in the instant matter, the jury in *Regalado* was instructed with CACI No. 1009B, and on appeal, the defendant argued that the trial court erred by failing to instruct the jury with his special instructions regarding *Hooker*'s affirmative contribution requirement. (*Regalado*, at pp. 591–592). The Court of Appeal held that the trial court properly rejected the defendant's proposed special instructions because they were "somewhat misleading in that they suggest[ed] that in order for the hirer to 'affirmatively contribute' to the plaintiff's injuries, the hirer must have engaged in some form of active direction or conduct. However, 'affirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions.' " (*Id*. at p. 594, quoting *Hooker*, *supra*, 27 Cal.4th at p. 212, fn. 3.) The *Regalado* court also found support for its conclusion in the use note for CACI No. 1009B, in which the Advisory Committee on Civil Jury Instructions recognized the potential for confusion in the "affirmative contribution" language in CACI No. 1009B and stated the view that the "affirmative contribution" requirement simply requires causation between the hirer's conduct and the plaintiff's injury under the "substantial factor" test, as set forth in CACI No. 1009B. (*Regalado*, pp. 594–595.)[4]

---

for Webcor to raise this argument for the first time in its reply. (*REO Broadcasting Consultants v. Martin* (1999) 69 Cal.App.4th 489, 500.)

[4]    In *Sandoval v. Qualcomm Inc.* (2018) 28 Cal.App.5th 381, review granted January 16, 2019, S252796 (*Sandoval*), a differently-composed panel of the same court reaffirmed *Regalado*'s holdings that CACI No. 1009B is an accurate statement of the law, and that the affirmative contribution requirement simply "require[s] causation between the hirer's retained control and the plaintiff's resulting injury." (*Sandoval*, at p. 417.)

12

Attempting to sidestep this holding, Webcor argues that *Regalado* "was really a sufficiency of the evidence case" and that the court's discussion of CACI No. 1009B was "dicta." This is incorrect. The portion of *Regalado* discussed above was not dictum because it was hardly " 'unnecessary to the decision in the case.' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3.) Rather, it was part of the court's rationale in rejecting the appellant's express claim of instructional error. That it was one of several independent bases for affirming the judgment does not make it dictum.

We acknowledge there are differing viewpoints among the courts that have touched upon this issue. (Compare *Regalado*, *supra*, 3 Cal.App.5th at pp. 594–595 [relying on advisory committee's use note to CACI No. 1009B] and *Sandoval*, *supra*, 28 Cal.App.5th at p. 417 [same], with *McCarty v. Department of Transportation* (2008) 164 Cal.App.4th 955, 977 [affirmative contribution requirement is "a *limitation* on the liability that the hirer would *otherwise* have" under common law negligence].) That said, it is unnecessary for us to resolve this issue today. Even if Webcor were correct that CACI No. 1009B's use of substantial-factor-causation does not correctly state the law regarding affirmative contribution, Webcor must still demonstrate prejudice from the claimed error. (*Soule*, *supra*, 8 Cal.4th at pp. 580–581.) We conclude any error did not result in a miscarriage of justice and was harmless.

"[W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule*, *supra*, 8 Cal.4th at pp. 580–581.)

Here, the state of the evidence strongly supports the inference that the jury found Webcor to have affirmatively contributed to Strouse's injury. Although in reviewing claims of instructional error, we must view the evidence in the light most favorable to the appellant (*Regalado*, *supra*, 3 Cal.App.5th at p. 594), some of the most probative testimony on this issue was undisputed and came from Webcor's own safety manager and its safety expert. Both Villela and Harrell acknowledged that Webcor created the expansion joints and retained exclusive control over the maintenance and repair of the

13

safety covers, thereby prohibiting the subcontractors from maintaining or repairing the safety covers themselves. The evidence at trial also established that the accident took place in a general access area under Webcor's control where subcontractors traversed for deliveries, and that Webcor retained control over safety in this area and knew about the problems with the safety covers in that area. Moreover, Villela testified it was reasonable for ACCO employees to trust that Webcor had properly installed, secured, and inspected the safety covers. Villela also admitted Webcor was responsible for conducting daily safety inspections of the worksite, though there was no documentation of inspections performed on the weekend before Strouse's Monday morning accident.

Additionally, the fact that the jury apportioned no fault to ACCO or Strouse and 100 percent fault to Webcor necessarily establishes its determination that Webcor's liability "is *not* ' "in essence 'vicarious' or 'derivative' in the sense that it derives from the 'act or omission' of the hired contractor." ' " (*Hooker*, supra, 27 Cal.4th at p. 212.) In other words, it cannot be said, for purposes of applying *Privette*'s bar to liability, that the "sole factual basis" for Webcor's liability was that it "failed to exercise a general supervisory power to require [ACCO] to correct an unsafe procedure or condition of [ACCO's] own making" or that "there [was] no evidence that [Webcor's] conduct contributed in any way" to the injury. (*Hooker*, *supra*, at pp. 210–211.) On the contrary, Webcor's affirmative act of prohibiting subcontractors from maintaining or repairing the safety covers, combined with its retention of control over safety in the general access area and its act of conducting daily inspections, reasonably induced the subcontractors and their employees to rely on the presumed adequacy of the safety covers in the line 53 area. Thus, the state of the evidence and the record here is amply distinguishable from that in *Hooker*, where Caltrans merely permitted the unsafe practices of the crane operator to continue, but was not shown to have contributed to the accident either through affirmative conduct or by inducing reliance. (*Id*. at p. 215.)

We see nothing in counsel's arguments at trial that may have capitalized on the claimed instructional error. Webcor cites portions of the closing argument of Strouse's counsel in which he argued that CACI No. 1009B was "the key instruction" regarding

14

Webcor's liability, and called the lack of inspections in the days before the accident "a big deal in this case." But Strouse's counsel also argued that Webcor negligently exercised its retained control over safety conditions by failing to make sure the safety covers were safe and secure; that the accident took place in a general access area that Webcor controlled; and that Webcor built, maintained, and was the responsible party for the condition of the safety covers. Meanwhile, Webcor's counsel clarified in his closing argument that in order to find Webcor's conduct was a substantial factor in Strouse's injury, the jury had to find that Webcor provided "a substantial contribution to the harm," which was more than simply "preventing [the condition] from existing." Taken together, counsels' arguments properly directed the jury to determine whether Webcor affirmatively contributed to the injury.

Finally, there is no indication in the record of jury confusion. The jury requested no rereading of CACI No. 1009B, submitted no questions concerning the substantial factor standard,[5] and requested no readback of any testimony pertinent to it. The jury deliberated for less than 90 minutes and unanimously found Webcor to be fully liable.

After an examination of the entire cause, we conclude Webcor has not demonstrated a reasonable probability that it would have obtained a more favorable result in the absence of the claimed instructional error. (See *Watson*, *supra*, 46 Cal.2d at p. 836; *Soule*, *supra*, 8 Cal.4th at pp. 580–581.) Thus, any perceived error regarding CACI No. 1009B was harmless.

### 2. Webcor's Modified BAJI No. 8.30

Webcor further argues the trial court erred in rejecting its proposed instructions. The first proposed instruction was a modified version of BAJI No. 8.30, which stated, in pertinent part: "A hirer who retains control over safety conditions at the work site is not liable to employees of the subcontractor for injuries sustained at the work site, unless the

---

[5] The jury had only two questions. The first was directed to question 7 on the special verdict form regarding the design of the expansion joint cover. The second was regarding damages and whether they could have an itemized list of the past medical expenses that were part of the stipulated amount presented to them.

15

hirer negligently exercised the retained control, and that negligent exercise affirmatively contributed to the employee's injuries. . . . Examples of affirmative contribution include, but are not limited to: [¶] 1. Actively directing a contractor or employee about the manner of performance of the contracted work. [¶] 2. Directing that work to be done in a particular manner or otherwise interfering with the means and methods of accomplishing the work. [¶] When the hirer does not fully delegate the task of providing a safe working environment but in some manner actively participates in how the job is done, the hirer may be held liable to the employee if its participation affirmatively contributed to the employee's injury. [¶] Passively permitting an unsafe condition to occur rather than directing it to occur does not constitute affirmative contribution. [¶] A failure to institute specific safety measures does not cause the hirer to be subject to liability unless the hirer had agreed to implement these measures. Thus, a failure to exercise retained control does not constitute affirmative contribution to the injury. An affirmative contribution must be based upon a negligent exercise of control. [¶] In order for James Strouse to recover against Webcor Construction, L.P., Webcor Construction, L.P. must engage in some active participation. While the passive permitting of an unsafe condition to occur is not an affirmative contribution, the act of directing that it occur, is active participation."

A trial court does not err in refusing to give instructions that are incomplete or erroneous, and the court is under no duty to revise a requested instruction to make it state the law correctly. (*Tossman v. Newman* (1951) 37 Cal.2d 522, 524–525 (*Tossman*).) Nor is it error to refuse to give instructions that are substantially covered by other proper instructions given by the court. (*Id*. at p. 525.) "Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition." (*Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718 (*Fibreboard*), citing *Chutuk v. Southern Counties Gas Co.* (1942) 21 Cal.2d 372, 381.)

We conclude the trial court did not err in rejecting Webcor's modified BAJI No. 8.30. Most of the relevant subject matter in this proposed instruction was adequately

16

covered by CACI No. 1009B, and as we have discussed, CACI No. 1009B's use of substantial-factor-causation in lieu of the term "affirmative contribution," even if erroneous, was not prejudicial.

Moreover, Webcor's modified BAJI No. 8.30 overemphasized the circumstances of a hirer's nonliability and the need for active direction by a hirer in order to show affirmative contribution, making these defense theories and issues unduly prominent. (*Fibreboard*, *supra*, 227 Cal.App.2d at p. 718.) Another portion of Webcor's modified BAJI No. 8.30 ("Passively permitting an unsafe condition to occur rather than directing it to occur does not constitute affirmative contribution") was substantially similar to language that was criticized in *Regalado*. (See *Regalado*, *supra*, 3 Cal.App.5th at p. 591 [special instruction no. 8].) We agree with *Regalado* that such language is "somewhat misleading in that [it] suggest[s] that in order for the hirer to 'affirmatively contribute' to the plaintiff's injuries, the hirer must have engaged in some form of active direction or conduct." (*Id*. p. 594; see *Hooker*, *supra*, 27 Cal.4th at p. 212, fn. 3.) Although portions of Webcor's modified BAJI No. 8.30 contained correct statements of law, the trial court was not obligated to rewrite the instruction by eliminating the objectionable matter. (*Tossman*, *supra*, 37 Cal.2d at p. 525.) Given the objectionable content, it was not error for the trial court to refuse Webcor's modified BAJI No. 8.30.[6]

### 3. Webcor's Special Instruction No. 2

For similar reasons, we conclude the trial court did not err in refusing to give Webcor's proposed special instruction no. 2, which stated that Webcor, "as the hirer, owes no duty of care to James Strouse as an employee of [ACCO], a subcontractor, to prevent or correct unsafe procedures or practices to which the hirer did not contribute by direction, induced reliance, or other affirmative conduct. The mere failure to exercise the power to compel the subcontractor to adopt safer procedures does not, without more,

---

[6]    Webcor argues it remedied the problem identified in *Regalado* by clarifying in its proposed special instruction no. 3 that an omission may constitute affirmative contribution. However, as we discuss below, special instruction no. 3 contained objectionable language of its own, which impaired its ability to provide clarification to the other instructions.

17

violate any duty to James Strouse." Portions of this instruction were substantially similar to language that was criticized in *Regalado* (see *Regalado*, *supra*, 3 Cal.App.5th at p. 590 [special instruction no. 2]), and we agree that such language, combined with the objectionable language in Webcor's modified BAJI No. 8.30, misleadingly suggested that a hirer must engage in active direction or conduct in order to affirmatively contribute to a plaintiff's injuries. (*Regalado*, at p. 594.) The trial court was not obligated to rewrite special instruction no. 2 by eliminating the objectionable matter. (*Tossman*, *supra*, 37 Cal.2d at p. 525.) Additionally, special instruction no. 2 was objectionable in that it repeated and compounded the overemphasis of Webcor's defense theories. (*Fibreboard*, *supra*, 227 Cal.App.2d at p. 718.)

### 4. Webcor's Special Instruction No. 3

This proposed instruction, entitled "Affirmative Contribution: Definition of Omission," stated: "Affirmative contribution need not always be in the form of actively directing a subcontractor or subcontractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to a subcontractor employee's injury. Such an omission occurs when the hirer reserves exclusive control over whether to take action to protect against potential construction-related hazards. Where either the hirer or subcontractor could take action, and the subcontract expressly delegated the hirer's workplace safety responsibilities to the subcontractor, the hirer's failure to exercise retained control is not a negligent exercise of control."

The first three sentences of Webcor's special instruction no. 3 correctly state the law set forth in *Hooker*'s footnote 3 as to when an omission can constitute affirmative contribution. The next sentence, however, suggests that in order for "[s]uch an omission" to constitute affirmative contribution, the hirer must retain "exclusive control" over the safety measure or condition. This does not accurately reflect the law as stated in *Hooker*.

As Strouse and ACCO point out, and Webcor acknowledges, the "exclusive control" language in special instruction no. 3 is derived from *Brannan v. Lathrop Const.*

18

*Assoc., Inc.* (2012) 206 Cal.App.4th 1170 (*Brannan*). In that case, a bricklayer (Brannan) working for a masonry subcontractor (Bratton) was injured after he slipped on wet scaffolding and fell. Brannan sued the general contractor (Lathrop) for negligence and premises liability for coordinating work on a rainy day. Division One of this court affirmed summary judgment for Lathrop because it was undisputed that Lathrop did not direct Brannan's work, did not direct him to climb over the scaffolding, and did not even know Brannan or other Bratton employees were climbing over the scaffolding in the manner they did. (*Brannan*, at pp. 1178–1179.) In so concluding, the court rejected Brannan's reliance on *Ray v. Silverado Constructors* (2002) 98 Cal.App.4th 1120 (*Ray*) by distinguishing it as a case in which the general contractor "had contractually reserved *exclusive* control over whether to close the roadway in order to protect motorists from potential construction-related hazards, and barred the subcontractor from closing it without the general's written consent. [Citation.] Here, there was no dispute either Bratton or Lathrop could have called a rain day and Bratton's subcontract expressly delegated Lathrop's workplace safety responsibilities to Bratton without reservation." (*Brannan*, at p. 1180.)

*Brannan*, however, was simply distinguishing *Ray* and did not purport to set forth a requirement of "exclusive control" in order for a hirer's omission to constitute affirmative contribution. And notably, the cited portion of *Ray* was not even about affirmative contribution; rather, it concerned whether the general contractor had retained control over the decision to close a roadway. (*Ray*, *supra*, 98 Cal.App.4th at p. 1134.) *Brannan*'s statement distinguishing inapposite case authority provides no support for Webcor's proposed "exclusive control" instruction.[7] (See *Tait v. San Francisco* (1956) 143 Cal.App.2d 787, 792 [statement in opinion may be inapplicable in different case].)

---

[7]    Furthermore, even if a hirer's exclusive control over a safety measure or condition were required in order for the hirer's omission to affirmatively contribute to the plaintiff's injury, Webcor was not prejudiced by the refusal to instruct the jury using this language. As discussed, the undisputed evidence established that Webcor did retain exclusive control over the condition of the safety covers.

19

The final sentence of Webcor's special instruction no. 3 states that even if the hirer's retained control is not exclusive ("Where either the hirer or subcontractor could take action. . . ."), the hirer nevertheless cannot be liable for an omission if the subcontract expressly delegated the hirer's workplace safety responsibilities to the subcontractor. This sentence is objectionable because it would have improperly directed the jury's attention to particular facts (i.e., the "sole" responsibility language in the Webcor–ACCO subcontract) and away from other evidence of the hirer's conduct that affirmatively contributed to the employee's injury. (See *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1678 [instruction "should not draw the jury's attention to particular facts"].) It also inaccurately restated *Brannan*, where the subcontract expressly delegated general contractor Lathrop's safety responsibilities to subcontractor Bratton "without reservation." (*Brannan*, *supra*, 206 Cal.App.4th at p. 1180.) Thus, to the extent Webcor contends proposed special instruction no. 3 was appropriate based on *Brannan*, the instruction did not state the delegation must be "without reservation" and therefore did not correctly capture *Brannan*'s holding.[8]

For these reasons, we conclude the trial court did not err in refusing to give Webcor's special instruction no. 3.

## 5. Negligence Per Se

The trial court instructed the jury on negligence per se under CACI No. 418. The instruction first provided the text of Cal-OSHA section 1632(a) and (b) (see *ante*, fn. 1), and then stated: "If you decide: [¶] 1) That Webcor Construction violated this law, and [¶] 2) That the violation was a substantial factor in bringing about the harm to James Strouse, then you must find that Webcor Construction was negligent. [¶] If you find that Webcor Construction did not violate this law or that the violation was not a substantial

---

8    In its reply brief, Webcor provides tables purporting to show how the challenged portions of special instruction no. 3 are derived verbatim from *Brannan* and *Ray*. This does not demonstrate error by the trial court in rejecting the proposed instruction. Indeed, the practice of taking excerpts from court opinions and "indiscriminately changing them into instructions to juries has been frequently criticized by the courts of this state." (*Fibreboard*, *supra*, 227 Cal.App.2d at p. 718.)

factor in bringing about the harm, then you must still decide whether Webcor Construction was negligent in light of the other instructions that are given."

Webcor argues the trial court erred in giving the jury a negligence per se instruction because an alleged violation of a Cal-OSHA regulation cannot be the basis for civil liability against a general contractor where compliance with that regulation has been delegated to the subcontractor. Webcor relies on *Ruiz v. Herman Weissker, Inc.* (2005) 130 Cal.App.4th 52, and *SeaBright*, *supra*, 52 Cal.4th 590, for the proposition that the "Safe Place to Work" statute (Lab. Code, § 6400) and Cal-OSHA regulations do not create a duty of care to a party that is not a defendant's own employee. This argument lacks merit for two reasons.

First, the premise of Webcor's argument is that the negligence per se instruction was necessarily used in this case to establish Webcor's *duty* of care. But Webcor provides no factual foundation for this claim of error, i.e., it provides no record cite indicating Strouse or ACCO relied on the Cal-OSHA requirements to establish an independent duty of care, as opposed to the relevant *standard* of care. Under Labor Code section 6304.5, "[s]ections 452 and 669 of the Evidence Code shall apply to this division and to occupational safety and health standards adopted under this division in the same manner as any other statute, ordinance, or regulation."[9] In other words, "Cal-OSHA provisions are to be treated like any other statute or regulation and may be admitted to establish a standard *or* duty of care in all negligence and wrongful death actions,

---

[9]      "Evidence Code section 452 permits judicial notice of state statutes and regulations. [Citation.] Evidence Code section 669, subdivision (a) codifies the common law doctrine of negligence per se, under which statutes and regulations may be used to establish duties and standards of care in negligence actions:  The failure of a person to exercise due care is presumed if:  [¶] (1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." (*Millard v. Biosources, Inc.* (2007) 156 Cal.App.4th 1338, 1350 (*Millard*).)

21

including third party actions." (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 928, italics added.)

Second, we are unpersuaded by Webcor's contention, based on *SeaBright*, that it was error to instruct the jury on negligence per se based on Cal-OSHA section 1632 because compliance with this regulation was delegated to ACCO. Although the subcontract generally stated that ACCO was "solely responsible" for the safety of its own employees, other relevant evidence, including the testimony of Webcor site safety manager Villela and Webcor safety expert Harrell, explicitly established that Webcor did not delegate to its subcontractors the duty to maintain and repair the safety covers, and that Webcor was the controlling employer responsible for compliance with section 1632 on the Project. This distinguishes *SeaBright*, where the airline was found to have implicitly delegated to the contractor the responsibility of complying with Cal-OSHA safety regulations pertaining to the very work-related condition (lack of safety guards over conveyors) that led to the plaintiff's injury.

Webcor further argues it was error to give a negligence per se instruction without first instructing the jury on affirmative contribution because, under *Millard*, *supra*, 156 Cal.App.4th 1338, Cal-OSHA regulations have not abrogated the *Privette* doctrine, and the regulations are admissible only where other evidence establishes the general contractor affirmatively contributed to the employee's injuries. (See *Millard*, *supra*, 156 Cal.App.4th at pp. 1350–1351.) As we have already discussed, the undisputed evidence amply established that Webcor affirmatively contributed to Strouse's injuries, and the jury apportioned no fault to ACCO or Strouse while finding Webcor 100 percent at fault. Thus, the failure to instruct the jury regarding the precise language of "affirmative contribution," even if erroneous, was harmless.

For these reasons, we conclude the trial court did not err in giving a negligence per se instruction.

**C. *ACCO's Motion for Attorney Fees***

Webcor argues the trial court erred in awarding attorney fees to ACCO because ACCO did not plead entitlement to attorney fees in its answer to the cross-complaint, and because it lacked standing to recover attorney fees paid by its insurance company.

"We review an order granting or denying fees for an abuse of discretion. . . . 'However, " '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action. . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' " (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 148–149.)

The prevailing party in an action or proceeding is entitled as a matter of right to recover costs, which includes attorney fees if authorized by contract. (Code Civ. Proc., §§ 1032, subd. (b), 1033.5, subd. (a)(10)(A).) There is no dispute that the subcontract between Webcor and ACCO contained an attorney fee provision.[10] Nor is there any dispute that ACCO was the prevailing party in Webcor's cross-action for indemnity, as Webcor obtained no relief from ACCO. (Code Civ. Proc., § 1032, subd. (a)(2), (4).)

Contrary to Webcor's first contention, a party is not required to plead entitlement to attorney fees as an item of damages in order to recover them in California. (*Allstate Ins. Co. v. Loo* (1996) 46 Cal.App.4th 1794, 1797–1798.) "It is now well settled that attorney fees, whether authorized by contract or statute, are recoverable under section 1033.5, subdivision (a)(10) as an element of costs, and rather than claim attorney fees as

---

[10] The attorney fee provision stated: "In the event the parties become involved in litigation or arbitration with each other arising out of this Agreement or other performance thereof in which the services of an attorney or other expert are reasonably required, the prevailing party shall be fully compensated for the cost of its participation in such proceedings, including the cost incurred for attorneys' fees and experts' fees. Unless judgment goes by default, the attorneys' fees award shall not be computed in accordance with any court schedule, but shall be such as to fully reimburse all attorneys' fees actually incurred in good faith, regardless of the size of a judgment, it being the intention of the parties to [be] fully compensated for all attorneys' fees and experts' fees paid or incurred in good faith."

an element of damages, the proper method to recover attorney fees is as an item of costs awarded upon noticed motion. [Citation.] Attorney fees based on a contract provision do not need to be demanded in the complaint." (*Chinn v. KMR Property Management* (2008) 166 Cal.App.4th 175, 194 (*Chinn*), disapproved on other grounds in *DeSaulles v. Community Hospital of Monterey Peninsula* (2016) 62 Cal.4th 1140, 1158.) Webcor cites no authority suggesting the rule should be any different for a cross-defendant in response to a cross-complaint.

Webcor's reliance on *Wiley v. Rhodes* (1990) 223 Cal.App.3d 1470 (*Wiley*) is misplaced. In *Wiley*, the court reversed part of a default judgment awarding attorney fees and punitive damages against the defendants on the grounds that such award violated due process where the plaintiff had not alleged entitlement to attorney fees or punitive damages in the complaint, and no notice of the amount of punitive damages had been given to the defendants prior to entry of default. (*Id.* at p. 1473.) Here, however, the due process considerations involved in a default judgment have no application. "Due process is satisfied by a noticed motion for attorney fees, duly served on the opposing party." (*Chinn*, *supra*, 166 Cal.App.4th at p. 194.)

Webcor cites *Garamendi v. Golden Eagle Ins. Co.* (2004) 116 Cal.App.4th 694 (*Garamendi*) as a non-default-judgment case where a different panel of this division found that an award of unpled attorney fees and damages violated the defendants' due process rights. But *Garamendi* involved a unique situation in which the defendants—a subcontractor (Rampart) and its insurer (Golden Eagle)—answered the complaint, actively defended the case, but then abandoned the litigation after the subcontractor failed to reactivate its corporate status and the insurance company declined to intervene on its own behalf. Although *Garamendi* was not a default judgment case, it involved the same concerns about the defendants' inability to anticipate their potential liability for unpled damages and attorney fees at the time they made the decision to forego litigating the case. (*Garamendi*, at pp. 708–709.) These concerns are entirely absent here. Webcor never withdrew from the case, and it cannot be said that Webcor had no ability to anticipate potential liability for attorney fees before they were awarded. Indeed, Webcor sought

24

attorney fees against ACCO in the prayer to its cross-complaint, so it knew from the inception of the cross-action that there was a contractual basis for the award of such fees to the prevailing party. And even then, fees were not awarded until after ACCO brought a noticed motion for attorney fees as costs, which Webcor opposed. Webcor's attempt to derive due process considerations from *Wiley* and *Garamendi* is meritless.

Webcor's standing argument fares no better. In *Staples v. Hoefke* (1987) 189 Cal.App.3d 1397, the court squarely held that the plaintiffs "were not entitled to avoid their contractual obligation to pay reasonable attorney fees based on the fortuitous circumstance that they sued a defendant who obtained insurance coverage providing a defense." (*Staples*, at p. 1410; *International Billing Services, Inc. v. Emigh* (2000) 84 Cal.App.4th 1175, 1193–1194 [defendants entitled to attorney fees even though fees were paid by their employer].)

Finally, Webcor cites *Bramalea California, Inc. v. Reliable Interiors, Inc.* (2004) 119 Cal.App.4th 468 (*Bramalea*) for the position that the award of attorney fees to ACCO constitutes a prohibited double recovery because ACCO suffered no out-of-pocket loss, and the collateral source rule does not apply because the cross-action was based in contract, not tort. In *Bramalea*, the court held that the collateral source rule (which allows an injured person to recover from the wrongdoer for damages suffered even if he has been compensated for the injury from a source wholly independent of the wrongdoer) applies only to tort damages, not to damages for breach of contract due to punitive nature of the rule. (*Bramalea*, at pp. 472–473.) This discussion has no application to the instant case. The defendant/cross-complainant in *Bramalea* sought attorney fees against the cross-defendants as damages on its breach of contract claim, not as the prevailing party in the litigation, and the court's decision was based on the inapplicability of the collateral source rule to contract actions and the fundamental principle that "[a] breach of contract is not actionable without damage." (*Id*. at pp. 472–473.) ACCO did not seek attorney fees as compensation for contractual damages, but as costs to which it was entitled as the prevailing party in Webcor's cross-action.

25

For these reasons, we conclude the trial court did not abuse its discretion in awarding attorney fees to ACCO as the prevailing party in the cross-action.

## DISPOSITION

The judgment is affirmed. Strouse and ACCO shall recover their costs on appeal.

_____

Fujisaki, J.


WE CONCUR:


_____

Siggins, P.J.


_____

Petrou, J.


A148863

Filed 4/23/19

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JAMES STROUSE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>WEBCOR CONSTRUCTION, L.P.,<br><br>Defendant, Cross-complainant, and Appellant;<br><br>ACCO ENGINEERED SYSTEMS,<br><br>Cross-defendant and Respondent. | A148863<br><br>(Alameda County<br>Super. Ct. No. RG13670376)<br><br>**ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION**<br><br>**[NO CHANGE IN JUDGMENT]** |

THE COURT:

The opinion in the above-entitled matter filed on March 27, 2019, was not certified for publication in the Official Reports. Upon due consideration, the request to publish the opinion, filed on April 15, 2019, is granted in part. Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, the opinion is certified for publication with the exception of parts B.2, B.3, B.4, and C of the Discussion.

There is no change in judgment.

Dated: _____                    _____ P.J.

1

James Strouse v. Webcor Construction, L.P.

(A148863)


Trial court:          Alameda County


Trial Judges:         Hon. Julia Spain


Attorneys:            LeClairRyan, Robert G. Harrison, Christiane Kinney; Lynch Gilardi
                      & Grummer, William Alexander Bogdan, Andrew Spaulding;
                      Defendant, Cross-Complainant, and Appellant.

                      Gerald A. Clausen; Jonathan Brand for Plaintiff and Respondent;
                      Foley Mansfield, Keith M. Ameele, Louis C. Klein, Margaret I.
                      Johnson for Cross-Defendant and Respondent.