Filed 8/31/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BARBARA GREEN et al., | |
| Plaintiffs and Respondents, | G057950 |
| v. | (Super. Ct. No. 30-2017-00958866) |
| HEALTHCARE SERVICES, INC., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Ronald L. Bauer, Judge. Affirmed.

Horvitz & Levy, Andrea L. Russi and Robert H. Wright; Horton, Oberrecht, Kirkpatrick & Martha, Kimberly S. Oberrecht and Carolyn A. Mush for Defendant and Appellant.

Strassburg, Gilmore and Wei, Justin K. Strassburg, William R. Gilmore, Adam R. Lugo; Esner, Chang & Boyer, Stuart B. Esner, Holly N. Boyer, Shea S. Murphy for Plaintiffs and Respondents.

Barbara Green (Barbara) filed this wrongful death action after her son Jeffrey Green (Green) jumped from the roof of drug rehabilitation treatment facility Anaheim Lighthouse (Lighthouse),[1] and ended his life. Lighthouse appeals from the judgment following a jury verdict in Barbara's favor. Specifically, it asserts the trial court committed reversible error by refusing to instruct the jury Green's suicide was a superseding cause of harm and on premises liability. It also claims the judgment must be reversed because the court improperly allowed opinion testimony by an undisclosed rebuttal expert. We find no error and affirm the judgment.

FACTS

I. *Green's Addiction Treatment at Lighthouse*

Lighthouse is a nonmedical residential detoxification and treatment facility. It is an unlocked, voluntary facility.

In his initial intake telephone call with Lighthouse's salesperson Laura Kurz prior to his admission, Green said he needed to get off the methadone and he wanted to live, but not like this. He stated: "'Every once in a while, it crosses my mind to end my life, but I want to live.'" Kurz said she often hears this kind of statement because she is usually talking to people on the worst day of their life. Green also told her his father had committed suicide a couple of years before. Green was 33 years old at the time of his admission to Lighthouse. Green had been addicted to oxycontin since age 16, and been taking a high dose of methadone since age 27.

Green's family was present for his intake interview at Lighthouse. No one suggested Green was suicidal, and Green stated he had no suicidal thoughts. In his depression assessment questionnaire, Green responded he had no thoughts of killing himself. Green completed a "no harm contract" where he agreed he was not going to harm himself or attempt suicide.

---

[1] Lighthouse does business as Healthcare Services, Inc.

Andrew Jonas, a marriage and family therapist intern, assessed Green upon his arrival. Jonas asked Green about suicide, any history of self-harm, and any desire to hurt himself or end his life. Green told Jonas he had no current or prior thoughts of suicide, hurting himself, or ending his life. Jonas classified Green as "no safety risk" because his only risk factor was a prior family suicide.

At trial, the experts disagreed whether Lighthouse should have admitted Green as a patient. Plaintiffs' expert, Dr. Michel Sucher, opined Green should have been in a medically managed detoxification (detox) program. Lighthouse's expert, Dr. Mace Beckson, testified Green did not need to be hospitalized for medical detox. He opined an opiate detox for a person who is otherwise young and healthy does not need to be in a hospital setting.

II. *Green Completes Detox and Transfers to Rehabilitation Treatment*

Green entered Lighthouse and began detox, which is housed in a separate facility than where patients undergo rehabilitation treatment. Six days after Green began detox, he reported "'detox was great.'" The detox staff person perceived Green's mood as good. Green was proud of himself and in "no type of distress."

Prior to Green's transfer from detox to treatment, Mirela Elena Casapu, a marriage and family therapist intern, met with him. She noted that Green was anxious and exhibiting withdrawal symptoms, but he denied any suicidal ideation.

Lighthouse's treating physician, Dr. Michael Bishara, decided to transfer Green from the detox program to the rehabilitation treatment program. Green did not ask to delay the transfer. At trial, the experts disagreed whether Lighthouse should have transferred Green.

After Green was transferred to treatment, he handed Casapu a note that read: "Temp I feel better[.] Im barely holding on[.] [M]y moms name is Barb Green her # is on the computer system also Garry is my brother his # & my other brother Joe

3

Green[.]  If you could give them a call to tell them I made it through detox.  I cant believe it.  If you could let them know I love them[.]  Ive got a ways to go but Im hanging tough.  I am taking subsol [sic] 3 times a day[.]  I would like to extend taking it as long as the doctor will allow even if its through the end of treatment[.]  [¶] If I leave the clinic can you tell the police clinic Im suicidal to hold me."

After receiving the note, Casapu immediately informed the program director, program administrator, and program coordinator.  She also called the supervising clinical psychologist, Dr. Preet Joneja.  Joneja instructed Casapu to assess Green and call the psychiatric emergency team if needed.

Casapu, who had performed at least 40 prior suicide assessments, spent one hour with Green and performed a suicide risk assessment.  Casapu again noted that Green was anxious and experiencing severe withdrawal symptoms.  At this meeting he reported having thought about suicide previously, but denied ever attempting suicide and denied any suicidal ideation.  Casapu asked Green about his note, specifically about the part referencing "[i]f I leave the clinic can you tell the police . . . Im suicidal to hold me."  Green responded that "'this is not now.'"  After she met with Green for about an hour, Casapu concluded he was not suicidal and did not call the psychiatric emergency team.

Based on Casapu's assessment, Joneja directed that someone check on Green every 30 minutes.  This meant someone had to have visual contact with Green and record these observations every 30 minutes.  Casapu left work around 6:00 p.m. and while she testified she told another staff member to check on Green, there is no indication that occurred.

Green's assessment with Casapu ended around 5:30 p.m., and shortly thereafter, Green seemed anxious and was seen pacing outside the medication room.  Green declined three offers for anxiety medication.  At Green's request, he was allowed to call his brother.  A staff member testified Green told his brother everything was okay, and he should not worry.

4

At trial, the experts disagreed about the cause of Green's suicide. Barbara's expert, Sucher, stated if Green had gotten the proper level of care, "he would [not] have killed himself or been in a situation where he could have killed himself." Sucher opined Green's suicide was preventable and was the result of his intolerable withdrawal symptoms. Sucher questioned the conclusions by the marriage and family therapist interns, Jonas and Casapu, that Green was not suicidal.

Lighthouse's expert, Dr. Mace Beckson, testified it is difficult to predict suicide with any accuracy. He noted that Green had not previously been suicidal. Beckson testified Green showed no indication of severe mental illness, and that Green's note was not a suicide note. He explained that a person normally writes a suicide note to be found after death, but here Green handed the note to a staff member. Green's act was not consistent with an intent to commit suicide. In contrast, the statement in the note about suicide was conditional: "'If I leave the clinic, can you tell the police I'm suicidal, to hold me.'" Beckson stated that Green was likely struggling with whether to stay at Lighthouse and wanted to set up a "fail-safe plan."

III. *Green Jumps from Rehabilitation Facility's Roof*

Lighthouse Executive Director, Chuck Richardson, saw Green at approximately 6:10 p.m. Green told Richardson he was excited to transfer to treatment. Richardson had no concerns that Green was suicidal.

At about the same time, staff member Bernard Finks gave Green his dose of detox medication. Green told Finks he wanted to go to group therapy at 6:30 p.m. David Fairweather, a support staff member, checked on Green at 6:25 p.m. Fairweather told Green that group therapy started in five minutes and Green responded, "'okay.'"

Sadly, Green jumped from the roof at 6:39 p.m. While there was no video footage of Green climbing onto the roof, one of the facility's cameras showed Green falling. He died from his injuries shortly thereafter.

5

IV. *Procedural History*

Barbara filed this action against Lighthouse, Casapu, Bishara, and Joneja. The operative complaint alleged claims for wrongful death, negligence, negligent hiring and supervision, intentional and negligent infliction of emotional distress, and intentional and negligent misrepresentation.

Prior to trial, the court granted Lighthouse's motion for nonsuit on Barbara's claims for negligent hiring and supervision, intentional and negligent infliction of emotional distress, and intentional and negligent misrepresentation. Only the wrongful death and negligence claims proceeded to trial.

The jury found Lighthouse was negligent and its negligence was a substantial factor in causing harm to Barbara. The jury also determined Green was negligent and his negligence was a substantial factor in causing harm to Barbara.

V. *Jury Instructions*

Lighthouse requested the trial court instruct the jury regarding the defense of superseding cause and submitted a proposed instruction based on CACI No. 432, as modified only to reflect case-specific information regarding the parties: "Lighthouse and . . . Casapu claim that they are not responsible for Barbara['s] harm because of the later misconduct of . . . Green. To avoid legal responsibility for the harm, . . . Lighthouse and . . . Casapu must prove all of the following: [¶] 1. That . . . Green's conduct occurred after the conduct of . . . Lighthouse and . . . Casapu; [¶] 2. That a reasonable person would consider . . . Green's conduct highly unusual or an extraordinary response to the situation; [¶] 3. That . . . Lighthouse and . . . Casapu did not know and had no reason to expect that . . . Green would act in a wrongful manner; and [¶] 4. That the kind of harm resulting from . . . Green's conduct was different from the kind of harm that could have been reasonably expected from . . . Lighthouse and . . . Casapu's conduct."

6

The trial court declined to instruct the jury regarding the defense of superseding cause. It concluded the defense did not apply because Lighthouse was a cause of Barbara's harm.

Lighthouse also requested CACI jury instructions Nos. 1000 to 1003 and 1011 regarding the elements of a premises liability claim, a property owner's duties, the factors relevant to show a property owner's reasonable care, and the requirements for showing constructive notice and knowledge of a dangerous condition of property. The court declined to provide the instructions based on Barbara's counsel's representation that he would not argue these issues to the jury.

During closing argument, Barbara's trial counsel argued the danger of allowing roof access and noted Green went over a railing to get on the roof. Counsel stated Lighthouse's chief executive officer (C.E.O.) told the Commission on Accreditation of Residential Facilities (C.A.R.F.): "'We cannot barricade access to the roof because the fire department won't allow us to.'" Counsel told the jury that was not true. Lighthouse's trial counsel objected as "improper argument from counsel," which the trial court overruled.

VI. *Jury Verdict and Motion for New Trial*

The jury found Casapu not negligent. The jury found Bishara negligent but determined his negligence was not a substantial factor in causing harm. The jury found Lighthouse negligent. It allocated the fault 65 percent to Lighthouse and 35 percent to Green. The jury awarded $1.7 million for past damages and $2.2 million for future damages. Following the verdict, Lighthouse moved for a new trial, which the trial court denied.

DISCUSSION

I. *Alleged Instructional Errors*

Lighthouse asserts this court should order a new trial because the trial court failed to instruct the jury on the superseding cause defense and premises liability. Each is discussed in turn below.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by [them] which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) When evaluating instructional error, we "'"'must assume that the jury might have believed the evidence upon which the [cause of action or defense of] the losing party was predicated.'"'" (*Strouse v. Webcor Construction, L.P.* (2019) 34 Cal.App.5th 703, 713-714 (*Strouse*); *Ash v. North American Title Co.* (2014) 223 Cal.App.4th 1258, 1277 ["We review the evidence most favorable to the applicability of the requested instruction"].)

"'"'That is not to say, however, that a failure properly to instruct a jury is necessarily or inherently prejudicial.'"' [Citation.] '[T]here is no rule of automatic reversal or "inherent" prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." [Citation.] . . . [¶] Instructional error in a civil case is prejudicial "where it seems probable" that the error "prejudicially affected the verdict.'" [Citation.] '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]" (*Strouse*, *supra*, 34 Cal.App.5th at pp. 713-714.)

8

A. *Superseding Cause*

Lighthouse asserts a new trial is required because the trial court erred by refusing to instruct the jury as to superseding cause. As an initial matter, superseding cause is an affirmative defense to be proven by the defendant. (*Arreola v. County of Monterey* (2002) 99 Cal.App.4th 722, 760.) An affirmative defense must be alleged in the answer or it is waived. (See *Quigley v. Garden Valley Fire Protection Dist.* (2019) 7 Cal.5th 798, 807 ["objections a defendant might have on the merits—including an objection that liability is barred by an affirmative defense—are ordinarily deemed 'waived' if the defendant does not raise them in its demurrer or answer to the complaint"].) While this issue was likely waived by Lighthouse by failing to allege it as an affirmative defense, we nevertheless reach the merits because Barbara had notice of the issue at trial and the bulk of the parties' briefing centers on this topic.

Assuming Lighthouse did not waive its superseding cause defense, we determine the trial court correctly found it inapplicable. Lighthouse correctly recites the state of the law on superseding cause. "In general, if the risk of injury is reasonably foreseeable, the defendant is liable. An independent intervening act is a superseding cause relieving the actor of liability for his negligence only if the intervening act is highly unusual or extraordinary and hence not reasonably foreseeable. [Citation.] Reasonable foreseeability in this context is a question for the trier of fact." (*Cline v. Watkins* (1977) 66 Cal.App.3d 174, 178.) In an action for wrongful death of an individual who has committed suicide, the intentional act of suicide "is a superseding cause of harm and relieves the original actor of liability unless such act was reasonably foreseeable or the failure to foresee such act was a factor in the original negligence. [Citation.]" (*Lucas v. City of Long Beach* (1976) 60 Cal.App.3d 341, 351 (*Lucas*).)

In *Lucas*, mother brought a wrongful death action against the city for suicide by her 17-year-old son, who was in police custody. (*Lucas*, *supra*, 60 Cal.App.3d at p. 344.) While in his jail cell, the son constructed a noose and hung himself. (*Id*. at p.

9

345.) State regulations required juveniles in custody to be checked once per hour, but the officer on duty, failed to check the son for nearly three hours. (*Ibid*.) The jury determined the officer's "violation of the inspection regulation was negligent as was the failure to summon medical care and these negligent omissions 'caused' the death, in that inspection or medical care would 'probably' have prevented it." (*Id*. at p. 347.) The jury also found the son's suicide was not reasonably foreseeable. (*Ibid*.)

The Court of Appeal concluded Stephen's action in fashioning the noose was a deliberate act and therefore no evidence supported a finding that his suicide was anything other than intentional. (*Lucas*, *supra*, 60 Cal.App.3d at p. 349.) It also determined the officer's negligent omissions did not cause "the mental condition which prompted Stephen to do what he did." (*Ibid*.) Stephen's intentional act was thus a superseding cause of harm unless it was reasonably foreseeable or the failure to foresee the act was itself negligent. (*Id*. at p. 351.) Because the jury found Stephen's death was not foreseeable, his suicide was, as a matter of law, the "superseding and the legal cause of his death." (*Ibid*.)

Lighthouse asserts because both *Lucas* and the present case involve the intentional act of suicide, superseding cause is implicated here. Not so. In *Lucas*, the appellate court concluded there was no evidence defendant was on notice Stephen was a suicide risk and the jury in fact found his suicide was not foreseeable. As such, the *Lucas* jury's negligence finding could not have been premised on the decedent being a suicide risk. The opposite is true in this case. The only possible basis for the jury's negligence finding here was that Green's suicide was foreseeable to Lighthouse. This finding rendered the superseding cause defense inapplicable.

Lighthouse also argues because foreseeability is a question of fact and it presented evidence the suicide was not foreseeable to Lighthouse, the superseding cause instruction was warranted. We disagree. The jury necessarily rejected this evidence by determining Lighthouse was negligent and its negligence was a cause of Green's

10

suicide. If the jury had agreed with Lighthouse that Green's suicide was not foreseeable to Lighthouse, it would have necessarily found that either Lighthouse was not negligent or that its negligence was not a cause of the suicide.

Since Barbara's theory of negligence was necessarily predicated on Lighthouse's failure to take adequate precautions to prevent Green's foreseeable suicide, that suicide as a matter of law could not be a superseding cause. As correctly noted by the trial court in refusing the proposed instruction, "I think this instruction would sort of say that [Green's] suicide is a superseding cause of [Green's] suicide." The suicide cannot be a superseding cause as it was the foreseeable conduct that rendered Lighthouse negligent.

Case law endorses the principle that the very conduct forming the basis for a plaintiff's negligence claim cannot also be a superseding cause. (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 725-726 ["It is well established that when a defendant's negligence is based upon his or her having exposed the plaintiff to an unreasonable risk of harm from the actions of others, the occurrence of the type of conduct against which the defendant had a duty to protect the plaintiff cannot properly constitute a superseding cause that completely relieves the defendant of any responsibility for the plaintiff's injuries"].)

*Haft v. Lone Palm Hotel* (1970) 3 Cal.3d 756 (*Haft*), is instructive. It concerned a wrongful death action following the drowning deaths of a father and son in defendants' motel swimming pool. The Supreme Court rejected defendants' assertion the drownings were a "'superseding'" cause which "'broke the chain of proximate causation'" flowing from the defendants' negligence in failing to provide a lifeguard or warning sign as drowning was the foreseeable risk to be protected against. (*Id*. at pp. 769-771.)

The Supreme Court stated it appeared defendant was attempting to misuse the superseding cause doctrine to escape all liability rather than consider the alleged

11

comparative fault of the father and son. (*Haft*, *supra*, 3 Cal.3d at p. 771.) It explained: "defendants seek to obtain a like dispensation through the jury's application (in reality, misapplication) of the nebulous 'superseding cause' doctrine. This argument has no more merit phrased in 'superseding cause' terms than it had in the context of 'imputed contributory negligence.'" (*Ibid.*)

Here, as in *Haft*, Green's suicide could not have "broken the chain of causation" since it was the very foreseeable risk that rendered Lighthouse's conduct negligent. Instead, Lighthouse could argue, which it did, Green's conduct was a contributing factor in causing Barbara's harm. The issue is one of comparative fault, not superseding cause. (See also *Pappert v. San Diego Gas & Electric Co.* (1982) 137 Cal.App.3d 205, 210-211 [death by electrocution precisely result expected when person trimming tree exposed to high voltage and thus "there was no factual issue on superseding cause for jury consideration and the trial court erred in presenting this issue to the jury"].)

The jury here would have been able to reach the issue of superseding cause, only after it first determined Lighthouse's negligence in failing to protect against Green's foreseeable suicide. However, as explained above, that negligence finding necessarily meant Green's suicide could not have been a superseding cause. This was exactly what the trial court sought to explain when it rejected Lighthouse's requested instruction. Indeed, Lighthouse does not suggest an alternative basis for the jury's negligence finding.

Finally, Lighthouse references the reluctance of courts generally to impose a duty to prevent a suicide absent a special relationship. It is difficult to understand precisely what role this analysis plays in Lighthouse's argument that a superseding cause instruction should have been given. The jury instructions, including those proposed by Lighthouse, were all premised upon an ordinary duty of care. There is no indication Lighthouse objected to this cause of action in any way prior to trial. It was only after the jury found Lighthouse liable for negligence that it began to argue Barbara

12

was required to prove a special relationship.  Notwithstanding the fact that Lighthouse did not raise this issue before verdict, it contends this matter is not waived because Barbara bore the burden of proof.  We are not persuaded.

"'As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried.  This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal.' [Citation.]" (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1344.)  "Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider. . . .  Bait and switch on appeal not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier." (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178.)  Lighthouse is not entitled to sit on its rights and only assert this claim in a motion for a new trial and on appeal.  We find no error.

B.  *Premises Liability*

Lighthouse contends the trial court erred by refusing to give its proposed premises liability instructions supporting the theory it was not negligent in the maintenance of its property and was not aware of the allegedly dangerous condition of property.  We disagree.

"Broadly speaking, premises liability alleges a defendant property owner allowed a dangerous condition on its property . . . ." (*Delgado v. American Multi-Cinema, Inc.* (1999) 72 Cal.App.4th 1403, 1406, fn. 1.)  A premises liability claim is distinct from a negligence claim as it ""'is grounded in the possession of the premises and the attendant right to control and manage the premises.'"" (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158.)  A defendant's failure to specifically request that the jury

be instructed according to a particular theory waives the issue on appeal. (*Conservatorship of Gregory* (2000) 80 Cal.App.4th 514, 520-521.)

"Under the doctrine of waiver, a party loses the right to appeal an issue caused by affirmative conduct or by failing to take the proper steps at trial to avoid or correct the error. [Citation.]" (*Telles Transport, Inc. v. Workers' Comp. Appeals Bd.* (2001) 92 Cal.App.4th 1159, 1167.) Accordingly, a party who acquiesces in the giving of a jury instruction may not later appeal the giving of that instruction. (*People v. Bolin* (1998) 18 Cal.4th 297, 326.)

Barbara did not allege a claim for premises liability in her complaint. Nor did she pursue such a theory at trial. Barbara did not present evidence or argument Green's death was caused by a defective or dangerous condition on Lighthouse's property. Thus, such an instruction would have been inappropriate.

Furthermore, prior to closing arguments, Lighthouse acquiesced to the trial court's decision not to give the premises liability instructions, though it reserved the right to raise the issue if premises liability was argued in Plaintiff's closing argument. The record is devoid of any request by Lighthouse for premises liability instructions at any point after closing argument or before the jury rendered a verdict. Lighthouse contends an objection made during closing argument preserved the issue for appeal. We disagree.

The only objection Lighthouse identifies during closing argument includes the following exchange: "[Plaintiffs' trial counsel:] Here is the C.E.O.'s letter to C.A.R.F. They need that C.A.R.F. accreditation so they can keep billing health insurance companies. The C.E.O. says, 'he was detoxed off of methadone.' Not true. 'He unexpectedly jumped off the roof.' Not true. 'We cannot barricade access to the roof because the fire department won't allow us to.' Also not true. [Defense's trial counsel]: This is improper argument from counsel. The Court: You may proceed."

This generalized objection is not tied to a premises liability claim. It appears to be directed to the manner in which counsel was summarizing the impeachment

14

evidence against Lighthouse's C.E.O. There was nothing specific as to premises liability. Viewed in context, Lighthouse's single objection to the argument, without a follow up request for a premises liability instruction, cannot be construed as an objection to improper argument concerning premises liability. Lighthouse carries the burden of presenting a sufficient record to establish that the claimed instructional errors were not invited or waived, which it has failed to do. (*Mayes v. Bryan* (2006) 139 Cal.App.4th 1075, 1090.)

II. *Rebuttal Expert Testimony*

Finally, Lighthouse argues a new trial is required in light of the trial court's admission of the rebuttal testimony of Andy Torres, which it contends constituted expert opinion of a non-designated expert witness in violation of Code of Civil Procedure section 2034.300. Lighthouse's assertion lacks merit.

"The decision to admit rebuttal evidence rests largely within the discretion of the trial court and will not be disturbed on appeal in the absence of demonstrated abuse of that discretion. [Citations.]" (*People v. Harris* (2005) 37 Cal.4th 310, 335.) "'"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason."'" (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431.) The trial court may permit counsel to call a rebuttal witness to contradict testimony on direct examination even where the rebuttal is impeachment on a collateral fact. (*People v. Morrison* (2011) 199 Cal.App.4th 158, 163.)

Lighthouse argues the trial court abused its discretion by overruling its objection to Torres' testimony on the ground it was improper rebuttal testimony by an undisclosed expert. The record shows Torres' brief rebuttal testimony was as a percipient witness contradicting Lighthouse C.E.O. Salyer's testimony in Lighthouse's case-in-chief. Salyer testified, in pertinent part, he spoke to someone at Anaheim "building and safety" who told him according to the fire marshal he could not barricade access to the roof. On cross-examination, Salyer specified he spoke with Torres at the

fire department several months prior to trial and Torres told Salyer that Lighthouse could not barricade access to the roof at the railing where Green accessed the roof. Salyer went on, "But what he told me was--and he referred me to the state code. You cannot barricade access to any roof because when--if and when there is a fire, they don't know where the hot spots are and they have to have free access to all points. Otherwise, it puts their lives in danger."

Torres was called to impeach Salyer's testimony on rebuttal. Torres, a fire inspector for the City of Anaheim, contradicted Salyer's testimony. Torres testified nothing in the fire code would prohibit Lighthouse from barricading access to the roof at the railing where Green accessed it. Lighthouse's trial counsel did not seek to cross-examine Torres.

Lighthouse fails to demonstrate how the court abused its discretion. Torres's brief testimony impeached and rebutted the testimony of Salyer as a percipient witness. Lighthouse's reliance on Code of Civil Procedure section 2034.300 (pertaining to expert witness testimony), is inapplicable. Furthermore, Lighthouse concedes the parties' joint witness list included Torres as a percipient witness. Lighthouse's feigned surprise about Torres as a rebuttal witness is unsupported by the record. We find no error.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


MARKS, J. *

*Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.