Filed 5/21/24  Valenzuela v. Dignity Health CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CELINA VALENZUELA,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>DIGNITY HEALTH,<br><br>Defendant and Respondent. | F084157<br><br>(Kern Super. Ct.<br>No. BCV-17-100354)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Thomas S. Clark, Judge.

The Gorski Firm and Vincent A. Gorski for Plaintiff and Appellant.

Reed Smith, Corrie J. Buck, and Tyree P. Jones for Defendant and Respondent.

-ooOoo-

## BACKGROUND

On August 28, 2017, plaintiff and appellant Celina Valenzuela (plaintiff) sued her employer, Dignity Health, alleging several causes of action, including employment-related discrimination and breach of implied contract. On February 22, 2019, plaintiff filed another complaint alleging, among other things, that Dignity Health had retaliated against her due to the 2017 lawsuit. The two cases were eventually consolidated.

The case proceeded to trial. After plaintiff's presentation of evidence, Dignity Health moved for nonsuit as to plaintiff's various causes of action. The court granted nonsuit as to all causes of action except one for breach of implied contract and one for breach of the implied covenant of fair dealing. After Dignity Health presented its evidence on those two claims, the jury returned special verdicts favorable to the defense. Plaintiff appeals.

## FACTS

Plaintiff was hired by San Dimas Medical Group on June 1, 1992, to work at Mercy Southwest Hospital in June 1992. Eventually, San Dimas Medical Group became Dignity Health. Dignity Health owns and operates healthcare facilities in California, Arizona, and Nevada with over 60,000 employees.[1]

Plaintiff later applied for a nurse position with what was then called Mercy Healthcare Bakersfield. The application was dated September 1, 1995, and bears plaintiff's signature. Above her signature appears an "applicant's statement" that includes the following language: "I also understand that if hired, my employment may be terminated at the will of either my employer or me."

Dignity Health's administrative policy and procedure applicable to Mercy Southwest Hospital (Mercy Southwest) was admitted into evidence. That document states, "It is the policy of Dignity Health to reserve the right to terminate the employment

---

[1] Defense counsel asserted in his opening statement that Dignity Health operates hospitals in 21 states.

2.

relationship at any time, with or without cause, and with or without notice. Dignity Health is an 'at-will' employer." The document stated its current effective date of December 15, 2014, and its original effective date of January 19, 2006.

For several years, plaintiff worked as a labor and delivery nurse at the family birth center of the hospital. Plaintiff's position was staff nurse until 2001 when she became a parttime clinical coordinator. Shortly thereafter, in approximately 2002, workers at Mercy Southwest unionized. While the clinical coordinator position was not part of the union, plaintiff nonetheless received at least some of the wage increases contemplated by union contract negotiations.

Plaintiff's duties as a clinical coordinator included the duties she previously had as a staff nurse, with the added the responsibility of overseeing the unit and ensuring every patient had a nurse. She also needed to coordinate emergency cesarean section procedures, verify timecards for payroll, write certain hospital policies, maintain logs concerning patients, and conduct newborn screenings, among other responsibilities.

When plaintiff began working as a clinical coordinator, she worked two days per week from 7:00 p.m. to 7:30 a.m. In 2008, she switched to daytime shifts, which continued through April 2016.

Dignity Health eventually eliminated the clinical coordinator position in favor of a new position called nurse shift manager. This change was a directive from Dignity Health's corporate office for purposes of "standardization." There was substantial overlap between the new nurse shift manager position and the old clinical coordinator position. However, the nurse shift manager position would have more management responsibilities than clinical coordinators. Each nurse shift manager has a team of employees that report directly to them. The nurse shift manager position was also more safety focused, as they would review work by perinatal specialists.

In December 2015, Dignity Health notified plaintiff about the elimination of the clinical coordinator position. Plaintiff was told she could apply for any other open

position with Dignity Health. Plaintiff was assured she would have a job of some kind; if not a nurse manager position, then "at least" a staff nurse position. "At no time was there talk about termination of employment."

Plaintiff ceased her work as a clinical coordinator in April 2016. She applied for the nurse shift manager position but was not selected for the role. Plaintiff felt she had the skills needed for the position. However, according to the former manager of the family birth center, the other applicants "were more than willing to adapt and mold to whatever the role evolved to, and [plaintiff] was not." Plaintiff did not want to work full time.

Plaintiff was put into a staff nurse position in the labor and delivery department, without the need for an interview, effective April 24, 2016. Dignity Health sent plaintiff a notice of her transfer into the staff nurse position, including a notice that her position was represented by the California Nurses Association and covered by the terms and conditions of the applicable collective bargaining agreement.

Autumn Alvarez, Rae Ann Schmunk, and Cheryl Harris were hired for the nurse shift manager position. According to plaintiff, none of these individuals are Hispanic. Plaintiff testified that she "didn't get [the] job over two younger – for lack of a better word, two younger, White women" with less seniority. Plaintiff testified that Schmunk received a parttime daytime position.

### Plaintiff's Leave Request

Plaintiff requested medical leave in October 2016 for a surgery. The request was initially denied on the grounds plaintiff did not have enough work hours to take leave. Plaintiff rescheduled her surgery. Plaintiff contacted Shana Gonsman in human resources and eventually her leave was approved. Plaintiff underwent her surgery on November 30, 2016.

### *Plaintiff's Failures to Adhere to Hospital Policy*

Dignity Health has nurses keep a checklist while administering a high-risk medication called Pitocin to patients. In April 2017, the checklist was provided in electronic form via a system called "Cerner." Plaintiff was trained on Cerner in March 2017, the month before the system was implemented. Plaintiff knew the checklist must be entered into Cerner every 30 minutes while a patient is receiving Pitocin.[2] When a nurse fails to complete the checklist, it is called a Pitocin "fallout."

Documents dated September 21, 2016, December 12, 2016, October 24, 2017, and November 14, 2017, reflect that plaintiff failed to properly complete the Pitocin checklist on several occasions. When a perinatal safety specialist provided her with a copy of the Pitocin checklist policy, plaintiff put it into a paper shredder.

A "corrective action form" with an incident date of November 29, 2017, reflects that plaintiff received a verbal warning as a result of her unsatisfactory performance.

Another "corrective action form" with an incident date of January 31, 2018, reflects that plaintiff received a "final written warning" for incorrectly initiating a doctor's "planned" orders without calling the doctor to inform them the patient was present. This resulted in a patient receiving a high alert medication for five hours without a doctor being aware. Once a doctor was involved, the Pitocin was discontinued because the patient's cervix was "not ripe enough." As a result, plaintiff was suspended for one shift and warned that future violations could result in additional disciplinary action, including termination.

Plaintiff testified that she did not know that "planned" orders differed from orders that were to be initiated.

---

[2] Plaintiff's counsel asserted in his opening statement that Pitocin is used to induce labor.

### *Plaintiff's Job Application to Bakersfield Memorial Hospital*

In 2017, plaintiff applied for a parttime position in labor and delivery at Bakersfield Memorial Hospital, which is also a Dignity Health facility. According to plaintiff, the manager of the labor and delivery unit, Brenda McMurtrey, told her she had the job and that "the only thing" she needed to do was turn in reference letters. Plaintiff subsequently turned in her reference letters. At some point McMurtrey introduced plaintiff to others in the unit as her "newest employee." However, a little over one month later, McMurtrey told her that a prior applicant decided to take the job. The other applicant had seniority at Bakersfield Memorial Hospital and was therefore entitled to priority pursuant to the collective bargaining agreement in place. Plaintiff never received an offer letter for the position.

### *Plaintiff's Switch to Per Diem Status at Mercy Southwest*

Plaintiff switched to "per diem" status in December 2018, which meant she would no longer receive benefits but apparently would be able to work fewer hours. Plaintiff claimed at trial she did this because "it was very hard to work full time because I felt like I was always walking on eggshells when I was working, and I felt, through the things that were happening like the write-ups, that the more I was there, the more I could get in trouble." Plaintiff felt ostracized from other nurses and believed she was being watched all the time to see if she would make a mistake.

In a pretrial deposition, plaintiff said she told her supervisor she needed to change to per diem status due to schoolwork. At trial, plaintiff claimed she had not told the supervisor the other reasons for her change because the supervisor was one of the people causing her problems.

Plaintiff again applied for the nurse shift manager position in 2020 but was not hired for the position.

Plaintiff claimed she was never chosen to be a resource nurse, which is the nurse who takes over when the charge nurse is busy. The resources nurse is also in charge of

making sure employees get breaks. Resource nurses receive additional differential pay for functioning in that role.

Triage nurses sees all of the patients that come into the unit. Triage nurses do not receive differential pay. Plaintiff was rarely assigned to be triage nurse.

When plaintiff was a full-time nurse, she was able to go to lunch while other nurses could not. Plaintiff could "feel" that the other nurses treated her as if they wondered why she was "so special." Plaintiff also claimed that charge nurses would speak to her with disdain or condescension.

At one point, one of plaintiff's superiors questioned why she was wearing dark-blue scrubs, when in fact the supervisor knew she had to wear dark scrubs due to a verified medical condition called menorrhagia. Dark blue scrubs were typically worn by people "in charge."

Plaintiff also testified that the birth center maintained a Facebook page that celebrated events and milestones of other employees, but not plaintiff.

### Meal/Rest Periods

When she worked over 10 hours in a day, plaintiff was entitled to two 30-minute meal periods. Plaintiff signed a written waiver of one of the two meal periods, with the express understanding that she would be paid for all working time. Plaintiff understood that when she had to miss a meal break caring for a patient, she would input that into the computer system. Plaintiff would be paid for the 30 minutes of time, plus an additional amount. When asked if there were any specific instances of missed, unpaid rest periods, plaintiff could only identify April 13, 2016.

Plaintiff testified that she carried "the phone" during meal breaks so that staff could get a hold of her. When asked how often her meal breaks were interrupted, plaintiff testified: "Every day I worked."

**DISCUSSION**

## I. Plaintiff Has Not Established Instructional Error

Plaintiff claims the court erred in instructing the jury concerning employment agreements.

" 'The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citation] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration.' " (*Strouse v. Webcor Construction, L.P.* (2019) 34 Cal.App.5th 703, 713.) " 'A reviewing court must adopt a construction of jury instructions which will support rather than defeat the judgment if they are reasonably susceptible to such interpretation.' " (*Liberty Transport, Inc. v. Harry W. Gorst Co.* (1991) 229 Cal.App.3d 417, 439, disapproved on other grounds by *Adams v. Murakami* (1991) 54 Cal.3d 105, 115.)

*Analysis*

Plaintiff first contends the court erred in instructing the jury that an express employment agreement existed.[3] Specifically, plaintiff points to the following instruction:

"If you find there is an at-will provision in an express written agreement, there cannot be an implied agreement to the contrary, and you must find that there is not an implied-in-fact contract."

But nowhere does this instruction tell the jury that an express agreement existed. Rather it informs the jury of how one potential finding (i.e., whether there was an at-will provision in an express written agreement) would mandate another finding (i.e., that there is not an implied-in-fact-contract).

---

[3] Plaintiff's arguments on this issue are not set off by subheadings, and it is unclear when plaintiff is merely describing contentions made below versus urging grounds for reversal on appeal. We address plaintiff's contentions as best we understand them.

If the instruction referred to "*the* express written agreement," perhaps plaintiff could argue the instruction assumed the existence of a written agreement. As given, however, the court's conditional instruction merely left open the possibility of a written agreement; it did not suggest a finding that one existed.

Plaintiff also contrasts the instructions the court gave with the ones she requested. However, we are only concerned with whether the instructions the court actually gave were correct. That is, even if plaintiff's proposed alternative was also acceptable, we would not reverse the judgment unless the court's instructions were prejudicially erroneous. Consequently, we do not reach whether plaintiff's proposed instructions would also have sufficed.

Plaintiff also argues that the "combination of her long-term employment, the communications from Human Resources, and Dignity Health's conduct and select application of union processes conferred upon her a reasonable belief she would only be terminated or demoted for good cause." This is merely an argument for why plaintiff believes certain favorable inferences should be drawn from the evidence. Even if we accepted this reasoning – which we do not – it would not render improper the court's instruction.

Plaintiff also contends that her September 1, 1995, employment "application" was not truly an application since she was already working as a staff nurse before and after the document was prepared. Plaintiff argues, therefore, she was not truly being "hired" at the time. While plaintiff does not make this explicit, the apparent import of this argument would be that the at-will provision did not apply because it referenced being "hired." These are all points plaintiff's counsel was free to make to the jury to convince them to find that the 1995 document did not govern her employment at the times relevant to her complaint. But it does not render improper the court's instruction, which left the issue up to the jury.

Plaintiff next suggests that defense counsel confused the jury when he stated: "I remind you – and you'll see in the Jury Instructions – it is the Plaintiff's burden of proof to prove that Dignity Health terminated her, in violation of her employment agreement." Plaintiff argues that she had an implied agreement, and not an express written agreement. However, counsel's statement simply refers to an "agreement" and does not say implied or express. Thus, even if it were undisputed that plaintiff's agreement was purely implied, counsel's statement does not indicate the contrary.

Plaintiff also makes a reference to a juror question as to a different instruction but does not cite to the record in support of this contention.

Finally, plaintiff references the case of *Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726. In that case, the court held that "[a]n implied-in-fact agreement to terminate only for good cause cannot arise if there is an express writing to the contrary, such as *a written acknowledgment* that employment is at will *or* an at-will provision in a written employment agreement." (*Id*. at p. 739, italics added.) In *Faigin*, the written employment contract did not state that the at-will provision applied to all entities related to or associated with the employer. (*Ibid*.) Plaintiff cites this to argue that the written acknowledgment in the 1995 application would not cover the period when her clinical coordinator position was eliminated. However, it is unclear how *Faigin* could support such a blanket statement. More fundamentally, because the effect of the at-will provision would turn on the meaning of the acknowledgment as applied to the circumstances of plaintiff's employment history with Dignity Health and/or its predecessor, it was for the jury to decide. And that is what that jury instruction ultimately did – left the issue to the jury.

Plaintiff argues that if we find the instruction prejudicially erroneous, it would also affect the cause of action for the breach of the implied covenant of good faith and fair dealing. However, as described above, we do not find prejudicial error.

10.

**II.    Plaintiff Has Not Established Error with Respect to Nonsuit on Cause of Action for Retaliation**

Defendant moved for nonsuit as to plaintiff's cause of action for retaliation. Defense counsel contended that plaintiff had not offered evidence to support the element that any adverse employment actions were "substantially motivated" by her filing of the first lawsuit. Defense counsel observed that its elimination of the clinical coordinator position and declining to hire plaintiff for the nurse shift manager all occurred before plaintiff filed the first lawsuit.

Plaintiff's counsel noted that there were also allegations as to Brenda McMurtrey. The court asked plaintiff to identify the evidence that McMurtrey was substantially motivated by a desire to retaliate against plaintiff for filing the lawsuit. Plaintiff's counsel cited the fact that she did not get the labor and delivery position at Bakersfield Memorial Hospital. The court observed that if there had been evidence McMurtrey had known of the lawsuit, perhaps that could have been enough to get the issue to a jury. However, the court concluded that, in fact, there was no evidence as to McMurtrey's motives or knowledge of the lawsuit. Plaintiff's counsel then asked if he could brief the issue and the court deferred its ruling. Eventually, the court granted nonsuit.

*Law*

**Nonsuit**

After the plaintiff's presentation of evidence to the jury, a defendant may move for judgment of nonsuit. (Code Civ. Proc., § 581c, subd. (a).) " ' "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor." [Citation.] In determining the sufficiency of the evidence, the trial court must not weigh the evidence or consider the credibility of the witnesses. Instead, it must interpret all of the evidence most favorably to the plaintiff's case and most strongly against the defendant, and must resolve all presumptions, inferences, conflicts, and doubts in favor of the plaintiff. If the

11.

plaintiff's claim is not supported by substantial evidence, then the defendant is entitled to a judgment as a matter of law, justifying the nonsuit.' " (*Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448, 1458.)

We review the trial court's grant of nonsuit de novo. (*Ibid*.)

**Retaliation**

Employers may not "discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding" under the California Fair Employment and Housing Act (FEHA). (Gov. Code, § 12940, subd. (h).) Thus, "in order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

*Analysis*

Here, the court held that plaintiff did not adduce sufficient evidence of the third element to warrant consideration by a jury. We agree. Plaintiff essentially argues that it is sufficient to identify the adverse employment actions and the protected activity (filing the first complaint), and to observe that the former occurred after the latter. But the mere observation that both protected activity and adverse employment actions occurred, does not prove a causal link between the two. That is, evidence that events A and B occurred is not evidence that event A caused event B. Moreover, any other rule would negate the third element as a distinct requirement. While plaintiff may have adduced evidence of elements one and two, she did not adduce substantial evidence of element three.

12.

**III.** **Plaintiff Has Not Established Error with Respect to Trial Court's Grant of Nonsuit as to Age, Race, and Disability Discrimination Claims**

*Background*

After the defense moved for nonsuit as to age discrimination, the court asked plaintiff's counsel: "What evidence can you point me to as to who made that decision not to hire her, and what evidence can you show me that that person or persons was substantially motivated in their decision by age?" Plaintiff's counsel replied, "Just a disparate impact that it turns out that the people that replaced them were younger women of a different race." The court ruled this was insufficient.

Separately, defense counsel moved for nonsuit as to plaintiff's race discrimination claim. Again, the court asked what evidence plaintiff could cite that race was a motivating reason for defendant's employment actions. Plaintiff's counsel observed that plaintiff was the only non-white person who was not hired after the clinical coordinator position was eliminated. The court granted nonsuit.

Defense counsel also moved for nonsuit as to plaintiff's disability discrimination claim. Again, the court asked what evidence counsel could point to showing the decision not to hire plaintiff was substantially motivated by her physical disability. First, counsel cited the fact that plaintiff's supervisor knew of her disability. The court responded by observing that there was no evidence that plaintiff's supervisor was the one who decided to eliminate the clinical coordinator position. In fact, the court stated that the only evidence on the subject was to the contrary. The court was presumably referring to the evidence that the decision was made by Dignity Health's corporate office. Counsel then cited the evidence that plaintiff's supervisor had questioned another employee as to why plaintiff was wearing dark scrubs when she already knew. The court found the evidence insufficient and granted nonsuit.

*Analysis*

We agree with the trial court's rulings, which focused on the essential element of causation.

"[Government Code] section 12940(a) prohibits an employer from taking an employment action against a person 'because of' the person's race, sex, disability, sexual orientation, or other protected characteristic. The phrase 'because of' means there must be a causal link between the employer's consideration of a protected characteristic and the action taken by the employer." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 215.) In other words, the facts that the plaintiff was a member of a protected class and was subjected to adverse employment actions are necessary, but not sufficient, to establish a discrimination claim. The plaintiff must show the two were causally connected.

Plaintiff's counsel's answers to the court's request for citation to evidence of causation as to race and age discrimination was essentially a concession that there was no such evidence in this case. All plaintiff had was evidence of her race and age, and, arguably, evidence of adverse employment actions. She did not have evidence tending to show her race or age were causally related to the adverse employment actions.

As for disability discrimination, counsel cited the testimony indicating plaintiff's supervisor questioned why she was wearing dark scrubs when, in fact, the supervisor already knew why. If this testimony is true, it reflects unfortunate conduct by plaintiff's supervisor. But it is not evidence that the clinical coordinator position was eliminated due to plaintiff's disability. The only evidence as to who made the decision to eliminate the clinical coordinator position indicated that the corporate office, not any individual person or hospital, made the decision. A stray remark by plaintiff's supervisor is not substantial evidence upon which a jury could find that a corporate decision to eliminate the clinical coordinator position was made "because of" plaintiff's disability.

14.

**IV. Plaintiff Failed to Establish Error as to Court's Grant of Nonsuit as to Alleged Failure to Provide Meal/Rest Breaks**

*Law*

Employees must be given one 30-minute meal period if they work more than five hours in a day, and two 30-minute meal periods if they work more than 10 hours in a day.[4] (Lab. Code, § 512, subd. (a).)[5] An employer satisfies this duty "if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1040 (*Brinker*).)

Plaintiff testified that she was not able to take uninterrupted meal breaks because she carried "the phone" with her so that staff could reach her. She stated that her meal breaks were interrupted every day she worked. However, the fact that an employee works during a meal break does not establish a violation of section 266.7, subdivision (b). The question is whether the employer relieved the employee of all duty and relinquished control over the employee. If the employer did so, the fact that the employee nonetheless chose to perform work during the meal break is immaterial. In other words, an "employer is not obligated to police meal breaks and ensure no work thereafter is performed." (*Brinker*, *supra*, 53 Cal.4th at p. 1040.) Plaintiff cites to no evidence indicating defendant required or expected plaintiff to carry and answer the phone on meal breaks.

---

[4] One meal period can be waived by mutual agreement in certain circumstances. (Lab. Code, § 512, subd. (a).)

[5] All further undesignated statutory references are to the Labor Code unless otherwise stated.

*April 13, 2016*

Plaintiff initially testified that she had marked a missed meal period in the "TEAM system" on April 13, 2016, yet was not paid.[6] Plaintiff later testified that she had gone to a different hospital that day for training on Cerner and *did* take her meal break after 5:00 p.m. when she returned to Mercy Southwest. Consequently, plaintiff failed to adduce evidence that defendant violated meal period rules on April 13, 2016.

## V. The Court Erred in Granting Nonsuit as to Plaintiff's Overtime Claim

### Law

With some important exceptions, employees must be paid extra when they work more than eight hours in a day or 40 hours in a week. (§ 510, subd. (a).) One such exception occurs when the employees adopt an alternative workweek schedule under section 511. (§ 510, subd. (a)(1).) That statute provides employees may adopt an alternative workweek that authorizes 10 hours (rather than eight hours) per day within a 40-hour workweek before overtime is paid. (§ 511, subd. (a).) The proposal must be approved by two-thirds of affected employees by secret ballot. (*Ibid.*)

Alternative work schedules can be approved as the single, standard schedule for workers in the unit or can instead be approved as part of a menu of work schedule options from which each worker could choose their preference. (§ 511, subd. (a).) The results of the election must be transmitted to the Division of Labor Standards Enforcement within 30 days after the results are final. (§ 511, subd. (e).)

---

[6] When asked if she was paid for all missed meal and rest periods other than April 13, 2016, plaintiff testified: "As far as I can identify."

This contrasts with plaintiff's characterization of her testimony to be that she had "other missed meal periods [that] were not entered into the T[EAM] System." The cited portions of the transcript do not support plaintiff's description.

*Background*

Defendant admitted as exhibit 289 its transmission of election results to the Division of Labor Standards Enforcement dated December 5, 2000 (hereafter, the "notice"). The document contained results of alternative workweek schedule votes applicable to nonexempt employees at the Mercy Southwest birth center. The document lists the applicable unit and the number of employees in the unit. One such unit was "All non-exempt employees (except clerical staff and educators) in the Birth Center at Mercy Southwest Hospital." The document further stated that in each of the votes conducted in the units, "More than 2/3 of the affected employees voted to implement the AWS [alternative workweek schedules]."

Plaintiff testified that, as a clinical coordinator, she worked from 7:00 p.m. to 7:30 a.m. (a shift over 12 hours long). After plaintiff's presentation of evidence at trial, defendant moved for nonsuit on plaintiff's overtime claim. Plaintiff's counsel argued that exhibit 289 was deficient because it did not identify the alternative schedule that was approved.

*Analysis*

Both parties miss the mark by focusing on whether the alleged defect renders the notice noncompliant with the Labor Code. The true importance of the notice's failure to identify what alternative schedule had been approved is not its alleged noncompliance with statute, but rather its weakened evidentiary value, and its inability conclusively negate plaintiff's unpaid overtime claim.

Plaintiff made a prima facie showing that she worked overtime hours by testifying that she worked more than eight hours per day. To negate this element, it was defendant's burden to show that a validly adopted alternative workweek schedule rendered plaintiff's shifts nonovertime. (See *Woodworth v. Loma Linda University Medical Center* (2023) 93 Cal.App.5th 1038, 1062, review granted Nov. 1, 2023, S281717.) Here, exhibit 289 merely establishes that some *unspecified* alternative workweek schedule was validly

17.

adopted as to the nonexempt employees of the birth center. That is not sufficient grounds for nonsuit because while some alternative workweek schedules would defeat plaintiff's claims, others would not. For example, if the employees had adopted a schedule with 10-hour shifts, then plaintiff would still be entitled to overtime pay because she worked more than 10 hours in a day.[7] Thus, in order to justify a nonsuit judgment in defendant's favor, the evidence would have needed to show that the validly adopted alternative workweek rendered plaintiff's approximately 12-hour shifts nonovertime. That did not occur here, so nonsuit was improper. We will therefore reverse nonsuit as to the 13th cause of action.[8]

## VI. Plaintiff Has Failed to Establish Error with Respect to the Trial Court's Grant of Nonsuit as to her Protected Leave Claims

Defendant moved for nonsuit as to plaintiff's cause of action for wrongful denial of protected leave. The court granted nonsuit on the grounds that she failed to show she was eligible for the protected leave that was allegedly denied, and that there was no harm.

### *Law*

It is unlawful for an employer "to refuse to grant a request by any employee with more than 12 months of service with the employer, and who has at least 1,250 hours of service with the employer during the previous 12-month period or who meets the requirements of subdivision [Government Code § 12945.2, subdivision] (r), to take up to a total of 12 workweeks in any 12-month period for family care and medical leave." (Gov. Code, § 12945.2, subd. (a).)

---

[7] In arguing the nonsuit motion, defense counsel suggested the alternative workweek was in fact three 12-hour shifts. But defendant does not cite to any evidence to that effect.

[8] In her brief, plaintiff says that if we remand on any other causes of action, her unfair competition law claims "need to be revisited." However, she does not support this assertion with adequately developed argument or citations to the appellate record. We do not address it further.

*Analysis*

We agree with the trial court that plaintiff failed to adduce evidence she was eligible for protected leave. Under Government Code section 12945.2, subdivision (a), an employee must meet two requirements: (1) 12 months of service with the employer and (2) "at least 1,250 hours of service with the employer during the previous 12-month period."[9] (Gov. Code, § 12945.2, subd. (a).) Plaintiff has not cited to any evidence that she had at least 1,250 hours of service with Dignity Health during the 12-month period preceding her request.

Plaintiff relies on the testimony of Dignity Health human resources director, Shana Gonsman. However, Gonsman testified that when plaintiff first applied for leave, she did *not* meet the minimum hours requirement. Plaintiff was later granted leave. Importantly, Gonsman testified she *did not know* if the subsequent grant of leave was based on additional time plaintiff had worked in the interim, which put her over the threshold, or if a recalculation of the hours she had worked prior to the original request showed she had enough hours all along. Gonsman's testimony that she did not know whether or not plaintiff had enough hours to qualify for leave is not evidence that she did, in fact, have enough hours. Plaintiff needed to adduce some positive evidence – such as employment records, etc. – showing she had worked 1,250 hours in the 12-month period preceding her request. She did not do so, and thereby failed to produce evidence on an essential element to her claim. Because we agree with this basis for nonsuit, we do not reach the additional grounds of lack of harm.

## VII. Plaintiff Forfeited Any Challenge to the Judgment Based on Court's Handling of Her Illness During Trial

Plaintiff indicates the court was ill-equipped to respond to her illness that arose during trial.

---

[9] Alternative criteria apply to certain persons employed by an air carrier. (See Gov. Code, § 12945.2, subd. (r).)

19.

*Background*

On January 18, 2022, the court stated on the record that it understood plaintiff had become ill with COVID-19 and would be appearing by Zoom from home. The court clerk stated that, for remote testimony, they usually tell attorneys to e-mail any exhibits to the witness, and they can view them on the computer as they testify.

The next day, Shana Gonsman testified remotely. When plaintiff's counsel used exhibits during his examination, the court display screen had to toggle back-and-forth between the witness and the exhibit. The transcript indicates that counsel had the ability to initiate the switch between witness and exhibit.

After a portion of plaintiff's testimony on January 24, 2022, defense counsel stated outside the presence of the jury that he was concerned about her ability to testify due to her illness. Counsel said he was concerned about the jurors becoming sympathetic seeing plaintiff in her present state. The court asked if defense counsel had any suggestion to which he replied, "Perhaps – I don't know – some medical certification that she's – this seems more like flu." Plaintiff's counsel did not make any objections but mentioned that plaintiff might obtain a doctor's release to be around people with a mask today or tomorrow. The court responded that it was more concerned with scheduling. Later in the conversation, the court said it did not have a preference as to plaintiff testifying in-person or by Zoom but was "more concerned with the issue that was raised as to her competence to understand and answer questions." The court continued, "So there's no misunderstanding, I didn't see any reason to have any concern; that she seemed to appropriately, for the most part, respond to the questions today." At the court's direction, plaintiff's counsel then asked her if her illness has affected her ability to testify that day, and she responded, "No." After additional questions, defense counsel said, "[T]he defense is satisfied that she testified competently today and sounds like she is able to do so tomorrow, as well." Plaintiff mentioned she could not stop coughing. In light of that,

20.

the court said that since she is symptomatic, she should testify remotely until symptoms like coughing stop.

Later, during one portion of her testimony, plaintiff's counsel asked, "Counsel, can you get [plaintiff] on the Zoom, please." Testimony then resumed. At another point in testimony, plaintiff's counsel asked to have plaintiff put on the Zoom screen and the court responded, "I'll leave that to counsel." Plaintiff's counsel responded, "Thank you."

At one point, the court had trouble communicating with plaintiff remotely. Plaintiff claims this was "the court [having] technical glitches." However, the record does not establish that. To the contrary, the court clerk stated on the record that "something's up on her side, I believe." Eventually, the problem was resolved, and testimony resumed.

At another point, apparently during a sidebar, the court said that the clerk said plaintiff was still having intermittent problems with Zoom.[10] The next line in the transcript is the court saying plaintiff was "back with us."

*Analysis*

The nature of plaintiff's claim around this issue is unclear. Most of the discussion of this issue in appellant's opening brief is factual summary rather than argument. The closest plaintiff comes to a legal argument on the issue is asserting that courts should have appropriate technology so that a witness like plaintiff can be fully measured by the factfinder. However, we decline to reach the merits of this contention because plaintiff did not object below.

"The forfeiture rule generally applies in all civil and criminal proceedings. [Citations.] The rule is designed to advance efficiency and deter gamesmanship." (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264.) " ' " ' "The purpose of the general

---

[10] While the record supports an inference that this particular issue may have originated with the court's connection or settings, rather than plaintiff's connection or settings, it hardly arises to a due process violation or any other type of reversible error.

21.

doctrine of waiver [or forfeiture] is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had.…" ' " ' " (*Ibid*.) " ' " ' "The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' " ' " (*Id.* at pp. 264–265, fn. omitted.)

Because plaintiff failed to object below, she cannot be heard to complaint on appeal. It is likely that if plaintiff had objected below, some accommodation could have been reached to her satisfaction. In any event, we find the contention forfeited.

## DISPOSITION

The grant of nonsuit as to the 13th cause of action is reversed. The jury verdicts and all other grants of nonsuit are affirmed. The matter is remanded for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.


POOCHIGIAN, Acting P. J.

WE CONCUR:


DETJEN, J.


MEEHAN, J.